**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LINDSEY DORCUS, CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, ROBIN AMER, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) | Case No. |
| | ) | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | ) | |
| v. | ) | |
| ADOBE, INC., a Delaware corporation, | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiffs, Lindsey Dorcus, Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Yohance Lacour, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant Adobe Inc. ("Adobe"), allege as follows:

**NATURE OF THE CASE**

1. Adobe sells trust. That is the foundation of Firefly, Adobe's family of generative AI model. Adobe tells the market that its generative AI is not merely useful, but responsible; not merely creative, but commercially safe. It says its models are trained on licensed content, its outputs can be used with confidence, and its tools protect attribution, provenance, and creator choice. Adobe has thus made permission the central virtue of its AI business. It asks

customers to trust Firefly because, Adobe says, creative work is not ownerless simply because it is available. That is the promise Firefly makes.

2. Adobe kept that promise only in its marketing. Adobe treated the human voices that built Firefly as ownerless — ignoring the speakers' rights, taking their voiceprints without asking, paying them nothing, and giving them no notice that their voices were being used at all. Adobe tells customers Firefly is trained on licensed content, Adobe Stock content, and public-domain material, and its chief executive has told the market that its voice models were trained on "purchased music and voice from IP owners." Those statements market a Firefly Adobe did not build. A license to use a recording is not a license to take the speaker's voiceprint. A contract with a platform is not a written release from the human being whose biometric identifier is extracted. A purchase from an IP owner is not consent from the voice subject. Adobe built a mirage of commercial safety around products whose construction violated the one thing Illinois law requires before collecting a voiceprint: consent from the person.

3. The products at issue are Adobe Firefly's voice AI and the voice-aware features Adobe has integrated across Creative Cloud, Premiere Pro, Adobe Podcast, Frame.io, Firefly Services, and GenStudio. Firefly's Generate Speech produces lifelike voiceovers in more than twenty languages. Its Translate Audio, Translate Video, and Translate and Lip Sync tools convert uploaded speech into new-language audio while preserving the original speaker's tone, rhythm, and cadence — generating, in Adobe's product

description, audio that "replicat[es] the original speaker's voice." Adobe Podcast detects and labels distinct speakers automatically. Premiere Pro's Speech to Text, speaker labeling, and Enhance Speech features analyze, separate, and reconstruct vocal output. These are not ordinary editing functions. They are speaker-aware voice systems, designed to identify, preserve, and reproduce the features that distinguish one human voice from another.

4. Systems of that kind cannot be built from nothing. To train and operate voice models capable of generating lifelike speech, preserving speaker tone across languages, and replicating vocal identity on demand, Adobe necessarily extracted mathematical representations of real human voices: pitch, timbre, resonance, cadence, accent, articulation, and phrasing. The AI industry calls those representations speaker embeddings, acoustic tokens, or voice features. By any name, they capture a speaker's vocal identity in a form sufficient to identify the speaker and replicate the speaker's voice. BIPA calls them voiceprints.

5. Adobe's voice technology continues to extract voiceprints every time a customer uses it. Adobe states that its AI dubbing technology "preserves voice characteristics including tone, cadence, and acoustic qualities" of an input speaker, and that the Firefly Voice Model "matches the original speaker's voice" across languages. Those admissions describe a system that extracts a speaker's vocal identity from each uploaded recording, processes that identity, and outputs new audio replicating it. That runtime extraction is itself the collection of a voiceprint under BIPA, independent of the foundational training-

data ingestion alleged separately herein. Every Translate session is a separate act of biometric collection.

6. Illinois enacted the Biometric Information Privacy Act, 740 ILCS 14/1 et seq. ("BIPA"), to govern exactly this conduct. BIPA recognizes that biometric identifiers, including voiceprints, are biologically unique to the individual and that, once compromised, the individual has no recourse: a voice cannot be replaced. Before a private entity may collect a person's voiceprint, BIPA requires written notice, disclosure of the specific purpose and length of term of collection, and a written release executed by the subject. Adobe complied with none of these requirements as to Plaintiffs.

7. Plaintiffs are seven Illinois residents whose recorded voices are among the most distinguished in their fields — Pulitzer winners, Peabody honorees, the recipient of the Order of Lincoln, and audiobook narrators recorded for the major American publishers. Their recordings were publicly distributed, professionally credited, and technically ideal for voice-AI training. None of them were told that their voices were being used to train Adobe's voice AI. None of them was asked. None signed a release. None of them consented.

8. Adobe has known the stakes of voice synthesis for a decade. In 2016, Adobe Research previewed Project VoCo, a technology that could edit recorded speech like text and, with a twenty-minute sample, add new words in a target speaker's voice. Adobe publicly acknowledged at the time that the technology could be used to make a person appear to say things they never said. By Firefly's 2023 launch, Adobe had built a public marketing position

around "commercially safe" generative AI but no public consent infrastructure for the non-user voice subjects whose vocal identities its models required. By 2025, Adobe was selling lifelike voice synthesis and runtime voice replication at commercial scale, still without consent infrastructure for the speakers who made those products possible. Adobe understood the technology. Adobe understood the stakes. Adobe chose not to ask.

9. Adobe's failure is not a failure of capability. For the image side of Firefly, Adobe created the Firefly Stock Contributor Bonus, which compensates Adobe Stock contributors when their licensed content is used to train Firefly's image models. For high-value voice talent, Adobe integrated with the ElevenLabs Iconic Voice Marketplace, importing consent-based licensing infrastructure for celebrity voices. For Adobe's customers, Adobe's Privacy Policy provides a deletion mechanism tied to in-product biometric processing. Adobe built consent infrastructure for image contributors. Adobe built consent infrastructure for celebrity voices. Adobe built deletion infrastructure for its own users. For the non-user Illinois speakers whose voices it took to build the voice AI it now sells, Adobe built nothing.

10. A voiceprint is not a preference, a setting, or a piece of metadata. It is a digital fingerprint of the human voice, a record of the anatomy that produces pitch and resonance and the lifetime of habit that produces accent, rhythm, and expression. A password can be changed; a credit card can be canceled; a Social Security number can be reissued. A voice cannot. The vocal

signature Adobe extracted is the same one Plaintiffs use to work, perform, report, narrate, and live.

11. Adobe monetizes the voiceprints it took through Creative Cloud, Firefly plans, Firefly Services APIs, and GenStudio. The products Adobe sells from that chain — lifelike synthetic speech, multilingual dubbing, voice preservation across languages, speaker separation, transcription, and audio enhancement — compete directly with Plaintiffs in the markets where they earn their livelihoods: audiobook narration, podcast production, broadcast journalism, documentary narration, e-learning, advertising, dubbing, and voiceover work. The same voice technology that turned Plaintiffs into training data now competes with them in the markets that depend on the voiceprints Adobe took.

12. Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), for Adobe's unlawful collection, retention, commercial exploitation, dissemination, and inadequate protection of their voiceprints. Plaintiffs also assert claims under the Illinois Right of Publicity Act ("IRPA"), the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), and Illinois common law for unjust enrichment. Plaintiffs seek statutory and actual damages, restitution, disgorgement, and injunctive relief, including an order requiring Adobe to identify the sources of its voice-training data, destroy unlawfully obtained voiceprints, and destroy or retrain the voice models in which those voiceprints are encoded.

13. Adobe promised Creativity for All. Adobe delivered something different. Customers were sold commercial safety Adobe had not built. Speakers were given biometric risk they had not been told about. Adobe attached credentials to outputs but took the voices behind those outputs without the credential that matters most: permission. Plaintiffs do not ask this Court to invent a rule. They ask it to enforce one. Before a company may convert a human voice into a commercial asset, it must ask the human being.

## PARTIES

14. Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than 200 audiobooks for major American publishers from her professional home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Adobe extracted her voiceprint are described at ¶¶ 92-94, 103-104.

15. Plaintiff Carol Marin ("Marin") is a citizen of Illinois and resides in this District. Marin is a five-decade investigative broadcast journalist whose career has been conducted primarily in Chicago. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Adobe extracted her voiceprint are described at ¶¶ 92-94, 95-96.

16. Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and

WMAQ-TV (NBC 5 Chicago). Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Adobe extracted his voiceprint are described at ¶¶ 92-94, 97-98.

17. Plaintiff Alison Flowers ("Flowers") is a citizen of Illinois and resides in this District. Flowers is an investigative journalist and audio producer who produces her audio reporting from Chicago through her production company Spiralbound. Flowers's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Adobe extracted her voiceprint are described at ¶¶ 92-94, 99-100.

18. Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's The City and as Managing Editor of Love + Radio. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Adobe extracted her voiceprint are described at ¶¶ 92-94, 101-102.

19. Plaintiff Yohance Lacour ("Lacour") is a citizen of Illinois and resides in this District. Lacour is a journalist, audio storyteller, writer, and playwright from the South Side of Chicago whose investigative podcast work, including the 2024 Pulitzer Prize–winning You Didn't See Nothin', is produced in Chicago. Lacour's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Adobe extracted his voiceprint are described at ¶¶ 92-94, 105-106.

20. Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced primarily in Illinois. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Adobe extracted her voiceprint are described at ¶¶ 92-94, 107-108.

21. Defendant Adobe Inc. ("Adobe") is a Delaware corporation and maintains its principal place of business at 345 Park Avenue, San Jose, California 95110-2704.

## JURISDICTION AND VENUE

22. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs. The proposed Class includes more than 100 members. Minimal diversity is satisfied because Plaintiffs are citizens of Illinois, and Defendant Adobe Inc. is a Delaware corporation with its principal place of business at 345 Park Avenue, San Jose, California 95110. None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

23. The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of liquidated damages or actual damages — $1,000 for a negligent violation or $5,000 for an intentional or reckless violation — and Plaintiffs may recover

those statutory damages on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026). Plaintiffs seek recovery under five distinct BIPA subsections, § 15(a), (b), (c), (d), and (e), each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment. On information and belief, Adobe extracted voiceprints and biometric information from voice recordings of hundreds of thousands of individuals whose recordings were produced or recorded in Illinois. The aggregate damages across the proposed Class, together with the injunctive, equitable, and other relief sought, far exceed CAFA's $5,000,000 threshold.

24. This Court has specific personal jurisdiction over Adobe under the Illinois long-arm statute, 735 ILCS 5/2-209, and consistent with the Due Process Clause of the Fourteenth Amendment. Adobe has purposefully directed conduct at Illinois and into this District. Plaintiffs' claims arise out of and relate to that Illinois-directed conduct. The exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

25. Adobe maintains a continuous, substantial, and revenue-generating commercial presence in Illinois. Adobe sells the Firefly Speech Model, the Firefly Voice Model, Generate Speech, Translate Video, Translate Audio, the Translate and Lip Sync API, and Enhance Speech — and the full range of Adobe's Creative Cloud, Document Cloud, Experience Cloud, and

Firefly products — to Illinois residents and Illinois businesses through adobe.com, firefly.adobe.com, the Creative Cloud and Firefly desktop applications, and Adobe's iOS and Android mobile applications. Adobe enters into recurring contractual relationships with Illinois residents through the Adobe General Terms of Use, the Adobe Creative Cloud Subscription Terms, the Adobe Firefly Terms, the Adobe Stock Additional Terms, and the Adobe Customer License Agreement, and accepts recurring monthly and annual subscription payments from Illinois subscribers under Firefly Standard, Firefly Pro, and Creative Cloud (Single App, All Apps, Pro, Teams, and Enterprise) plans. Each subscription renewal, each Generate Speech prompt, each Translate Video or Translate Audio upload, each Translate and Lip Sync API call, and each Enhance Speech request from an Illinois user is a separate commercial transaction with an Illinois resident or business. Adobe represents that its products are used by employees at more than seventy-five percent of Fortune 500 companies, many of which maintain principal offices or substantial operations in Illinois and in this District. Adobe could geoblock Illinois. Adobe has chosen not to. Adobe derives substantial revenue from Illinois.

26. Adobe's Illinois contacts are suit-related in four reinforcing respects, each of which independently supports specific personal jurisdiction.

27. *First,* Adobe extracted voiceprints from voice recordings produced and recorded in Illinois. The biometric source material, the human voice, is produced by the muscles, tissues, breath, and learned speech patterns of the

speaker. Each Plaintiff produced his or her voice while physically present in Illinois. The audio encoding of each Plaintiff's voice, the recording itself, was created in Illinois, in Illinois studios, by Illinois-based producers, using Illinois-based equipment, by speakers physically located in Illinois. The recordings were uploaded from Illinois to publicly accessible audio platforms. Adobe acquired those recordings from platforms — including YouTube, Spotify, Apple Podcasts, Audible, Apple Books, and Libro.fm — on which the speaker's name, professional biography, geographic location, and content catalog were publicly displayed in platform-level metadata. The identifying information was visible to Adobe at the time of acquisition. Adobe's sourcing of voice recordings from these platforms was not geographically blind: it was the deliberate acquisition of identifiable Illinois-origin biometric material from identified Illinois speakers. Adobe knew, or with the application of automated metadata-extraction tools standard in any AI laboratory operating at Adobe's scale could have known, that it was acquiring biometric material from speakers in Illinois. The biometric data Adobe ingested does not become non-Illinois biometric data because the server that processed it sits in a data center outside Illinois. The biometric source material was generated in Illinois. The biometric identifiers belong to Illinois residents. The invaded privacy interest is that of Illinois residents. The duty to provide written notice and obtain a written release under 740 ILCS 14/15(b) was owed to Illinois persons. The failure to perform that duty was localized where those persons reside and where their voices were produced and recorded. Adobe's extraction of voiceprints from voice recordings produced and

recorded in Illinois is conduct directed at Illinois irrespective of where Adobe's training infrastructure is physically located.

28. *Second*, Adobe extracts voiceprints in Illinois on a continuing, per-upload basis through Translate Video, Translate Audio, and the Translate and Lip Sync API. When an Adobe user located in Illinois uploads an audio or video file from an Illinois device to those services, Adobe receives the upload at Adobe-controlled endpoints, runs the file through the Firefly Voice Model, identifies each speaker in the recording, and extracts a representation of that speaker's distinctive vocal characteristics in order to synthesize translated speech in the same voice. The biometric extraction occurs in real time, on Adobe's command, in response to data Adobe receives from Illinois. On information and belief, Illinois users have uploaded, and continue to upload, recordings featuring the Illinois-recorded voices of Plaintiffs, of other professional voice talent who produced their recordings in Illinois, and of incidental Illinois-recorded speakers, to Translate Video, Translate Audio, and the Translate and Lip Sync API. Each upload causes Adobe to extract a fresh voiceprint of an Illinois-recorded speaker. Each extraction is Adobe's own conduct, performed by Adobe's own model, on data transmitted to Adobe from Illinois, producing biometric output Adobe retains and uses. Each runtime extraction is a discrete and separate act of biometric data collection accomplished through Adobe's commercial presence in Illinois.

29. *Third*, the voiceprints Adobe extracted are encoded in commercial products Adobe sells and delivers into Illinois every day. Adobe's commercial

activity in Illinois is the downstream monetization of the upstream biometric extraction at issue in this case. Each Generate Speech prompt submitted by an Illinois user causes Adobe's Firefly Speech Model to generate synthetic speech whose acoustic and stylistic capabilities exist because of the voiceprints encoded in the model's parameters. Each Translate Video, Translate Audio, and Translate and Lip Sync API call submitted by an Illinois user causes the Firefly Voice Model to produce voice-preserving translation output whose capability to mimic the input speaker exists because of the voiceprints encoded in the model's parameters. Each Enhance Speech request submitted by an Illinois user causes Adobe's voice models to reconstruct audio using acoustic representations the models acquired from training data. The voiceprints Adobe extracted from Plaintiffs' recordings, on information and belief, are encoded in the parameters of those commercial models. Adobe's continuing commercial deployment of those models into Illinois — every subscription payment, every API call, every Generate Speech output Adobe sends back to an Illinois device — is the continuing commercial use of the unlawfully extracted voiceprints. The Illinois sales and the Illinois extraction are two ends of a single integrated commercial chain.

30. *Fourth*, Adobe commercially exploits the voices and identities of Illinois residents in violation of IRPA by developing, marketing, and distributing voice synthesis products to Illinois customers and by disseminating voice-simulative outputs into Illinois. Adobe's voice synthesis products generate audio outputs whose vocal characteristics are derived from the foundational

voice models in which Plaintiffs' voiceprints are encoded. Adobe's distribution of those outputs into Illinois through Adobe-controlled distribution channels is the in-Illinois commercial use of Plaintiffs' protected identities. The tortious effects of Adobe's commercial exploitation are felt by Illinois residents in Illinois, in the Illinois markets where Plaintiffs work, on the Illinois platforms through which Adobe distributes its voice outputs to Illinois customers.

31. Adobe's possession of voiceprints and biometric information derived from voice recordings of Illinois residents is ongoing. BIPA § 15(a) imposes continuing obligations on entities that possess biometric identifiers, including the duty to develop and publish a written retention and destruction schedule and the duty to comply with that schedule. Adobe has been in possession of voiceprints derived from Illinois-recorded voice recordings since the date of extraction and remains in possession of those voiceprints today, encoded in the parameters of the Firefly Speech Model, the Firefly Voice Model, and the downstream commercial products built on those models. The persons whose biometric data Adobe holds are persons whose voices were produced and recorded in Illinois. Adobe's ongoing retention, ongoing commercial use, and ongoing failure to obtain consent or comply with BIPA's notice, written-release, retention-schedule, profiting, dissemination, and protection requirements are continuing wrongs directed at Illinois-recorded speakers and felt in Illinois. Each day Adobe continues to possess the unlawfully extracted voiceprints, each day Adobe continues to operate the foundational voice models in which those voiceprints are encoded, and each day Adobe continues to

deliver commercial voice products built on those models into Illinois is a separate day of Illinois-directed contact.

32. The exercise of specific personal jurisdiction over Adobe in this District is reasonable. Illinois has a strong and particularized sovereign interest in providing a forum for the redress of unlawful collection and commercial exploitation of biometric identifiers of persons whose voices were produced or recorded in Illinois, an interest the Illinois General Assembly expressly identified in enacting BIPA, 740 ILCS 14/5, the Illinois Right of Publicity Act, the Illinois Consumer Fraud and Deceptive Business Practices Act, and the Illinois Uniform Deceptive Trade Practices Act. Plaintiffs, as Illinois residents whose recordings were produced in Illinois and whose biometric privacy was invaded in Illinois, have a corresponding interest in litigating in their home forum. The burden on Adobe of litigating in this District is not undue. Adobe reported fiscal-year 2025 revenue of approximately $23.77 billion, employs approximately 31,360 people worldwide, and is an experienced litigant in federal courts across the United States. Adobe maintains a continuous commercial presence in Illinois through which it solicits, executes, and renews tens of thousands of subscription contracts with Illinois residents and businesses. Adobe could reasonably anticipate being haled into court in this District for claims arising from its extraction and commercial exploitation of biometric data sourced from voice recordings produced and recorded in Illinois.

33. The named Plaintiffs are Illinois residents whose voice recordings were produced and recorded in Illinois. The proposed Class is defined to

include only natural persons whose voice recordings were produced or recorded in Illinois. The claims of every Class member arise from Adobe's extraction, retention, and commercial use of voiceprints derived from Illinois-recorded voice material. Every Class member's claim has the same Illinois-located biometric source, the same Illinois-located injury, and the same Illinois-located ongoing harm.

34. Venue is proper in this District under 28 U.S.C. § 1391(b)(1). Adobe is a resident of this District within the meaning of 28 U.S.C. § 1391(c)(2) and § 1391(d) because Adobe's contacts with this District are sufficient to subject Adobe to personal jurisdiction in this District if this District were a separate State.

35. Venue is independently proper in this District under 28 U.S.C. § 1391(b)(2). A substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. Plaintiffs reside in this District. Plaintiffs' voice recordings were produced and recorded in this District. Adobe's collection, capture, extraction, and commercial exploitation of biometric identifiers belonging to residents of this District occurred without notice, consent, or written release. Adobe markets, sells, distributes, and delivers the voice synthesis products built on those biometric identifiers to residents and businesses in this District through adobe.com, firefly.adobe.com, the Creative Cloud and Firefly desktop applications, Adobe's iOS and Android mobile applications, and Adobe's enterprise sales channels. Adobe's runtime extraction of voiceprints through Translate Video, Translate Audio, and the

Translate and Lip Sync API occurs in response to uploads from this District. Adobe's ongoing possession and continuing commercial exploitation of Plaintiffs' voiceprints, through products Adobe sells and delivers into this District on a recurring subscription basis, is a continuing course of conduct giving rise to Plaintiffs' claims in this District. The economic and privacy injuries Plaintiffs and Class members have suffered, including displacement in the professional voice markets where Plaintiffs earn their livelihoods, are felt in this District.

## FACTUAL BACKGROUND

### *Adobe and Its Voice Business*

36. Adobe knows what a voiceprint is. Adobe's Privacy Policy says voiceprints are biometric identifiers protected by United States law. And for nearly a decade, Adobe has extracted voiceprints from human voice recordings, without notice, without consent, without a written release, at every stage of a research-and-product program that began in 2016 and culminated, in October 2025, in the commercial launch of voice synthesis at scale. Plaintiffs are among the speakers whose voices Adobe took.

37. Adobe has been building voice synthesis technology since 2016. Adobe Research, Adobe's in-house research division, has published research on voice and audio synthesis continuously since that year. Senior Adobe Research scientists in Adobe's Speech AI and Audio Research Groups — including Zeyu Jin, Rithesh Kumar, Jiaqi Su, Prem Seetharaman, Oriol Nieto, Justin Salamon, and Nicholas J. Bryan — have authored or co-authored peer-

reviewed papers on neural speech synthesis, neural audio coding, voice conversion, voice watermarking, and zero-shot voice synthesis. The technical mechanism at the center of this case — extracting a representation of a speaker's distinctive vocal characteristics from a recording of that speaker, and using that representation to synthesize new speech reproducing the speaker's voice — has been the explicit operating principle of Adobe's voice-synthesis research program from the start.

38. On stage at Adobe MAX in San Diego in November 2016, Adobe Research scientist Zeyu Jin demonstrated "Project VoCo." Using approximately twenty minutes of voice samples from a target speaker, Jin showed that Adobe's software could insert words the speaker had never uttered and synthesize them in the speaker's own voice, indistinguishably. The system worked by analyzing the source recording, decomposing it into phonemes, and constructing a voice model capable of generating new speech in the same speaker's voice. Adobe's contemporaneous description: "We have developed a technology called Project VoCo in which you can simply type in the word or words that you would like to change or insert into the voiceover. The algorithm does the rest and makes it sound like the original speaker said those words."[1] The biometric extraction Adobe demonstrated in 2016 is the biometric extraction at issue in this case.

---

[1] Lulu Chang, *Adobe's working on technology that's basically Photoshop for audio recordings*, Digital Trends (Nov. 4, 2016), https://www.digitaltrends.com/computing/adobe-project-voco-speech-synthesis/ (last visited on May 13, 2026).

39. Adobe's voice technology has been continuously productized since Project VoCo. Adobe presented VoCo's productized speech-enhancement descendant, internally code-named "Project Awesome Audio," at Adobe MAX in 2019. Adobe shipped speech enhancement as the Enhance Speech feature in Adobe Podcast (internally "Project Shasta") in mid-2022. Adobe demonstrated AI dubbing under the internal name "Project Dub Dub Dub" at Adobe MAX 2023. Adobe productized AI dubbing in Translate Video and Translate Audio inside Adobe Firefly in 2024 and 2025. Each of these systems is part of a continuous research program at Adobe Research devoted to building generative models of speech, including "personalized voice generation", using acoustic samples of individual speakers.[2]

40. On October 28, 2025, at Adobe MAX 2025 in Los Angeles, Adobe launched commercial voice synthesis at scale. Adobe publicly announced the Firefly Speech Model, the Firefly Voice Model, and the public-beta launch of Generate Speech. Adobe markets the Firefly Speech Model as a "commercially safe" multilingual text-to-speech model with a library of more than seventy voices across more than twenty languages. Adobe markets the Firefly Voice Model as powering Translate Video, Translate Audio, and the enterprise Translate and Lip Sync API, and as preserving an input speaker's voice

---

[2] Adobe Research, *The Story of Project Dub Dub Dub: From Adobe MAX Sneak to cutting-edge AI translation tool inside Adobe Firefly* (July 17, 2025), https://research.adobe.com/news/the-story-of-project-dub-dub-dub/ (last visited on May 13, 2026); see also *Project Dub Dub Dub*, Adobe MAX 2023 Sneaks, https://www.adobe.com/max/2023/sessions/project-dub-dub-dub-gs6-9.html (last visited on May 13 2026).

characteristics across translated audio output. The product Adobe launched in October 2025 is the commercial culmination of the nine-year research program that began with Project VoCo.

41. Adobe's commercial voice products today span the full range of AI voice technology offered to creators and enterprises: text-to-speech synthesis through Generate Speech; cross-lingual voice synthesis through the Firefly Voice Model; AI dubbing through Translate Video and Translate Audio; AI lip-syncing through the Translate and Lip Sync API for enterprise customers; and speech enhancement through Enhance Speech in Adobe Podcast and the Firefly app. Every one of these products depends on the voice characteristics Adobe's underlying voice models, the Firefly Speech Model and the Firefly Voice Model, learned during training. Training is where voiceprints and biometric information are extracted from source recordings. Adobe sells access through Firefly Standard, Firefly Pro, and Creative Cloud subscriptions; licenses the Translate and Lip Sync API to enterprise customers; and integrates ElevenLabs' Multilingual v2 model into Generate Speech as a selectable voice generation option alongside Adobe's own Firefly Speech Model.

*How AI Voice Synthesis Works*
*and What Adobe's Privacy Policy Calls It*

42. AI voice synthesis works by extracting and encoding the distinctive acoustic features of individual speakers — timbre, pitch, resonance, cadence, articulation, phrasing, dynamics, emotional expression — from recordings of human speech. The AI research community calls these encodings "speaker

embeddings."[3] BIPA calls them voiceprints. 740 ILCS 14/10. BIPA separately defines "biometric information" to mean "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." Id. The function of the encoding, to capture the biologically and behaviorally unique features that identify an individual speaker, controls the statutory classification, not the label the AI industry uses.

43. Adobe's product documentation describes its voice processing in terms aligned with BIPA's biometric definitions. Adobe represents that the Firefly Voice Model "recognizes speech and translates it into a different language while matching the original speaker's voice."[4] Adobe represents that its AI dubbing technology "preserves voice characteristics including tone, cadence, and acoustic qualities" of an input speaker.[5] Adobe Research's public account of "Project Dub Dub Dub" — the research project that became the Firefly Voice Model — expressly identifies "preservation of a speaker's identity "

---

[3] Jakubek et al., *Deep speaker embeddings for Speaker Verification: Review and experimental comparison*, 127 Eng. Appl. Artif. Intell. 107232 (2024), https://www.sciencedirect.com/science/article/abs/pii/S0952197623014161?via%3Dihub (last visited on May 13, 2026) ("The term embedding refers to a unique "fingerprint", which is a compressed representation of each utterance or recording and becomes a high-level feature for further classification. The speaker embedding is a simple but effective methodology to represent the speaker's identity in a compact way as a vector of fixed size.")

[4] Adobe, *AI Dubbing for video localization*, Adobe Firefly, https://www.adobe.com/products/firefly/features/ai-dubbing.html (last visited on May 13, 2026).

[5] Adobe, *AI Dubbing for video localization*, Adobe Firefly, https://www.adobe.com/products/firefly/features/ai-dubbing.html (FAQ: "Hw is AI dubbing different from traditional dubbing?") (last visited on May 13, 2026).

as a defining design objective. Adobe could not deliver voice-preserving translation, dubbing, or lip-sync output without first capturing the input speaker's distinctive vocal signature. The capture is the voiceprint.

44. Adobe-affiliated researchers have published peer-reviewed papers describing the underlying voice synthesis pipeline. *VoCo: Text-based Insertion and Replacement in Audio Narration* (2017) presented a system that synthesized new words in a target speaker's voice from approximately twenty to forty minutes of that speaker's recordings.[6] *GR0: Self-Supervised Global Representation Learning for Zero-Shot Voice Conversion* (2024) presented an approach to converting input audio to a different speaker's voice from only a short reference of the target speaker.[7] Each paper describes work that requires the extraction of speaker-identifying acoustic representations from voice recordings.

45. Adobe's corporate disclosures admit that its voice processing collects voiceprints. Adobe's Privacy Policy, last updated October 24, 2025, expressly enumerates "biometric identifiers or information defined under

[6] Zeyu Jin, Gautham J. Mysore, Stephen DiVerdi, Jingwan Lu & Adam Finkelstein, *VoCo: Text-Based Insertion and Replacement in Audio Narration*, 36 ACM Trans. Graphics 96 (Art. No. 96) (July 2017), https://doi.org/10.1145/3072959.3073702 (last visited on May 13, 2026) (three of the five authors (Mysore, DiVerdi, Lu) are listed as Adobe Research. The other two (Jin, Finkelstein) are Princeton; Jin subsequently joined Adobe Research as a Senior Research Scientist and led Project Dub Dub Dub).

[7] Yunyun Wang, Jiaqi Su, Adam Finkelstein & Zeyu Jin, *GR0: Self-Supervised Global Representation Learning for Zero-Shot Voice Conversion*, *in* Proc. 2024 IEEE Int'l Conf. on Acoustics, Speech & Signal Processing (ICASSP) 10566, https://doi.org/10.1109/ICASSP48485.2024.10448232 (last visited on May 13, 2026) (IEEE Xplore Doc. No. 10448232) (Jiaqi Su and Zeyu Jin are listed as Adobe Research, United States of America; Wang and Finkelstein are Princeton.).

United States laws or other applicable laws (e.g., faceprints and voiceprints, etc.)" among the categories of "Sensitive personal information" Adobe collects.[8] Adobe's Privacy Policy further states that Adobe's consumer features process "characteristics like face and voice" and that "such characteristics may be considered biometric identifiers or biometric information under certain US laws or other applicable privacy laws."

46. Adobe wrote those words and published them on October 24, 2025, just four days before Adobe launched the Firefly Speech Model and the Firefly Voice Model at Adobe MAX.

47. Adobe has nevertheless implemented no notice, no consent, no written release, no retention policy, no destruction policy, and no subject-access process for the voiceprints it extracts from non-users — neither for the voice professionals in its training data nor the third-party speakers captured in user-uploaded recordings at runtime.

*Adobe's Public "Commercial Safety" Representations to Congress, Investors, and the Marketplace*

48. Adobe's commercial differentiation strategy is built on a single representation: that Adobe trains its AI models on properly licensed and consented data. Adobe has made that representation to the United States Senate under oath, to investors, to enterprise customers, and to the public, for

[8] Adobe Privacy Policy (Last updated: October 24, 2025) https://www.adobe.com/privacy/policy.html {"such characteristics may be considered biometric identifiers or biometric information under certain US laws or other applicable privacy laws."; "Where we process biometric identifiers or biometric information to deliver a feature requested by you…"; "Biometric identifiers or information defined under United States laws or other applicable laws (e.g., faceprints and voiceprints, etc.);" (Last visited May 13, 2026)

years. None of those representations has ever been accompanied by disclosure of the source, scale, provenance, license, or rights status of the voice recordings used to train the Firefly Speech Model or the Firefly Voice Model.

49. Adobe's Executive Vice President, General Counsel, and Chief Trust Officer Dana Rao testified before the United States Senate Judiciary Committee's Subcommittee on Intellectual Property in 2023 that Adobe "set the expectations that we had for ourselves of trying to design a model that was going to be commercially safe"[9] and that "[e]very single AI feature that goes to market goes through the [AI Ethics] review board." Rao testified that "We trained our first Firefly model only on licensed images from our own Adobe Stock photography collection. If needed for accuracy or bias reduction, we intend to expand that dataset to include openly licensed content and public domain images where copyright has expired."[10] Rao also publicly represented that Adobe "trained our generative AI model Firefly on our own licensed Adobe

[9] Adobe's "commercially safe" representation, across its product marketing, enterprise agreements, congressional testimony, and indemnification offering, is a copyright-clearance representation: it promises that Firefly outputs do not infringe third-party copyrights. Adobe has never represented "commercial safety" to mean compliance with biometric-privacy statutes. Adobe's repeated affirmative representations about copyright safety, alongside its silence about biometric-privacy compliance, are themselves probative: Adobe knows the two questions are distinct, and Adobe chose to make affirmative representations about only one of them.

[10] Artificial Intelligence and Intellectual Property — Part II: Copyright: Hearing Before the Subcomm. on Intellectual Property of the S. Comm. on the Judiciary, 118th Cong. (2023) (statement of Dana Rao, Exec. Vice President, Gen. Counsel & Chief Trust Officer, Adobe Inc.), https://www.judiciary.senate.gov/imo/media/doc/2023-07-12_pm_-_testimony_-_rao.pdf (last visited on May 13, 2026).

Stock images, other works in the public domain, moderated generative AI content, and work that is openly licensed by the rightsholder."[11]

50. Adobe's Chair and Chief Executive Officer. Adobe's Chair and Chief Executive Officer Shantanu Narayen has publicly committed that "we have to build AI that is commercially safe and respects the rights of the creators whose work it learns from." Narayen has stated that Adobe will "respect IP" in the age of generative AI. Narayen has personally championed the Content Authenticity Initiative, the global content-provenance coalition Adobe co-founded in 2019, and the Coalition for Content Provenance and Authenticity, of which Adobe is a founding member. Narayen has made those representations on stage at industry summits, in interviews with major business and technology publications, and in Adobe's public-facing materials.

51. Adobe markets the entire Firefly family of generative-AI products, including the Firefly Speech Model and the Firefly Voice Model, as "designed to be commercially safe." Adobe's Enterprise Firefly Legal FAQs, marketing pages, and enterprise sales materials all repeat the representation. Adobe's enterprise indemnification offering for Firefly outputs is built on it. More than seventy-five percent of the Fortune 500, by Adobe's own representation, pay for Firefly in reliance on Adobe's claim that the underlying training data was properly sourced.

[11] Dana Rao, *The FAIR Act: A New Right to Protect Artists in the Age of AI*, Adobe Blog (Sept. 12, 2023), https://blog.adobe.com/en/publish/2023/09/12/fair-act-to-protect-artists-in-age-of-ai (last visited on May 13, 2026).

*Eleven Words: The Entirety of*
*Adobe's Voice-Training-Data Disclosure*

52. Adobe has never disclosed the sources, scale, or provenance of the voice training data used to train its foundational voice synthesis models. Adobe has published no model card, no data sheet, no training-data manifest, and no transparency report identifying what voice recordings it used, where it obtained them, or whether any of the speakers consented.

53. In coverage of Adobe MAX 2025, Adobe's Vice President of Generative AI Alexandru Costin told The Verge: "We purchased music and voice from IP owners, that's why we have the confidence to offer it as commercially safe."[12] That single-sentence statement — delivered to a trade publication — is the entirety of Adobe's public sourcing disclosure specific to the voice training data behind the Firefly Speech Model. Adobe has not identified the IP owners. Adobe has not published the agreements. Adobe has not named the voice talent. Adobe has not disclosed the volume of recordings purchased. Adobe has not stated whether the IP owners had the rights to license the speakers' voice biometric identifiers, or whether the speakers themselves consented. Adobe has made no comparable disclosure regarding the training data for the Firefly Voice Model, which powers Translate Audio, Translate Video, and the Translate and Lip Sync API. Moreover, Costin's statement concerns people whom Adobe

---

[12] Jess Weatherbed, *Adobe's Firefly Can Now Generate AI Soundtracks and Voiceovers*, The Verge (Oct. 28, 2025), https://www.theverge.com/news/807809/adobe-firefly-ai-audio-generate-soundtrack-speech (last visited on May 13, 2026).

characterizes as holding intellectual property rights in the recordings. BIPA regulates *biometric* identifiers, which pertain to the individual whose voice was captured, not the recording's copyright holder.[13]

54. The conspicuous absence of detailed voice-training-data disclosure stands in marked contrast to Adobe's contemporaneous transparency about its other AI training corpora. Adobe has affirmatively identified Adobe Stock, openly licensed content, and public-domain content as the sources for the Firefly image model.[14] Adobe has affirmatively identified named music-industry partners and licensed recordings as the sources for the Firefly Audio Model that powers Generate Soundtrack. Adobe has identified no sources for the Firefly Speech Model or the Firefly Voice Model. If Adobe's voice models had been trained on properly licensed and consented data, Adobe, the company that built the Content Authenticity Initiative and represented to the United States Senate that Firefly is commercially safe, would have an obvious commercial incentive to say so. It has not.

[13] The "IP owners" from whom Adobe purchased voice content — record labels, audiobook publishers, podcast networks, voice-talent agencies, and similar intermediaries, on information and belief, hold copyright in the sound recordings. They do not hold the biometric rights in the speakers' voiceprints. Copyright protects original expression fixed in a tangible medium. 17 U.S.C. § 102. BIPA protects the speaker's biologically and behaviorally unique vocal signature, regardless of who owns the copyright in the recording. 740 ILCS 14/10, 14/15(b). A copyright license conveys the right to reproduce and distribute the recording. It does not convey the speaker's biometric rights. Those rights are personal to the speaker and transferable only by the speaker's own written release. 740 ILCS 14/15(b). This is not a copyright case. Adobe extracted Plaintiffs' biometric identifiers without obtaining a written release from the only person who could have given one: the speaker.

[14] "Public domain" is a copyright concept. A recording enters the public domain when its copyright expires or is dedicated. 17 U.S.C. § 302. Public-domain status under copyright law has no effect on the biometric rights of the speaker captured in the recording. A 1925 audiobook recording now in the public domain still has a speaker whose voiceprint, during life, was protected by the same biometric privacy interests recognized in BIPA. Public-domain copyright status does not extinguish, transfer, or release biometric rights.

*Adobe Has Previously Misrepresented Firefly Training Data*

55. Adobe's pattern of making "commercially safe" and "licensed" representations about training data that did not match the underlying practice documented in the public record. On April 12, 2024, Bloomberg published the results of an investigation into the training data behind Adobe's Firefly image generator.[15] The Bloomberg investigation revealed that, despite Adobe's repeated public representations that Firefly was trained on licensed Adobe Stock images, openly licensed content, and public-domain content, and despite Adobe's marketing of Firefly as a "commercially safe" alternative to image-generation competitors like Midjourney, Adobe had in fact trained the Firefly image model in part on AI-generated images produced by competing AI image generators, including Midjourney itself. Bloomberg reported that approximately 5% of the Firefly image training corpus consisted of AI-generated images, including those generated by the same scraping-based AI competitors against which Adobe positioned Firefly as the ethical alternative.

56. Adobe has now applied the identical pattern to its voice models. Adobe describes the Firefly Speech Model and the Firefly Voice Model as "commercially safe." Adobe represents, through Costin's statement that it "purchased music and voice from IP owners," that the voice training data was

---

[15] Rachel Metz, *Adobe's 'Ethical' Firefly AI Was Trained on Midjourney Images*, Bloomberg (Apr. 12, 2024), https://www.bloomberg.com/news/articles/2024-04-12/adobe-s-ai-firefly-used-ai-generated-images-from-rivals-for-training (last visited on May 13, 2026).

licensed. Adobe has declined to publish the underlying training-data manifests, the licenses, the rights-holders' identities, or the voice talent rosters. The pattern is the same. The representations are the same. The opacity is the same.

57. Adobe previously misled everyone. On information and belief, Adobe is doing it again.

*Adobe Built Consent Infrastructure for the Categories of Training Data Adobe Chose to Build It For. Adobe Did Not Build It for Plaintiffs*

58. Adobe operates extensive consent and compensation infrastructure for select categories of training-data subjects. Adobe knows how to obtain consent. Adobe knows how to compensate. Adobe has done both, repeatedly, for the training-data categories Adobe judged commercially or legally necessary.

59. *Adobe Stock contributors*. Adobe operates the Adobe Stock Contributor Bonus program, under which Adobe Stock contributors whose images were considered for inclusion in the Firefly image-model training corpus are eligible to receive compensation. The program is structured around explicit notice and explicit financial consideration. Adobe knows the names of the contributors. Adobe knows the licenses Adobe holds. Adobe knows the compensation Adobe has paid.

60. *ElevenLabs Iconic Marketplace integration*. Adobe integrates ElevenLabs' Multilingual v2 voice model directly into the Generate Speech feature surface in Adobe Firefly, as a selectable voice generation option

alongside Adobe's own Firefly Speech Model.[16] ElevenLabs operates a consent-and-licensing framework for the celebrity and public-figure voices distributed through its "Iconic Marketplace," under which the rights holder for each voice must affirmatively approve any commercial use, on a project-by-project basis, with explicit contract terms. ElevenLabs publicly represents that "every performer or estate signs a bespoke contract before ElevenLabs trains an AI model on their voice" and that "rights holders maintain approval authority over usage." Adobe ships ElevenLabs' performer-first consent framework alongside Adobe's own Firefly Speech Model in the same product. Adobe's customers can select between two voice-generation options inside the same Adobe interface: one paired with a documented consent framework, and one paired with no consent framework at all. The consent architecture exists. Adobe is shipping it. Adobe did not build any analogous framework for the voices used to train the Firefly Speech Model.

61. *Music-industry rights holders*. Adobe trained the Firefly Audio Model, which powers Adobe's Generate Soundtrack feature, also launched at Adobe MAX 2025, on music recordings it claims were licensed from named music-industry partners. Adobe's head of generative AI Alexandru Costin publicly stated that for music, Adobe "purchased music directly from IP owners and trained their AI model exclusively on licensed content." Adobe contrasted

[16] Counsel for Plaintiffs have also filed parallel putative class actions in this District against other AI developers whose models were trained on voice recordings, including *Amer v. Eleven Labs, Inc.*, No. 1:26-cv-05437 (N.D. Ill. filed May 11, 2026), as well as actions against Google, Meta, Microsoft, Apple, Amazon, Samsung, and Nvidia.

its music-licensing approach with that of Suno and Udio, two AI music startups Adobe identified as facing copyright-infringement litigation from major record labels and independent musicians. Adobe acknowledged, by its conduct and its statements, that AI music training requires affirmative licensing from rights holders. Adobe applied that principle to music after the music-industry copyright threat became unavoidable. Adobe did not apply that principle to the voice professionals whose voices it used to train the Firefly Speech Model and the Firefly Voice Model.

62. The consent infrastructure for Plaintiffs does not exist. Adobe built consent infrastructure for Adobe Stock contributors. Adobe ships consent infrastructure through its ElevenLabs integration. Adobe built consent infrastructure for music-industry rights holders. Adobe built none for the broadcast journalists, podcasters, audiobook narrators, voice actors, and other voice professionals whose recordings, on information and belief, were ingested into the training pipelines for the Firefly Speech Model and the Firefly Voice Model. The asymmetry is not the product of technical impossibility, regulatory ambiguity, or institutional unfamiliarity. It is an institutional choice.

*Adobe Knew*

63. Adobe was not operating in ignorance of biometric privacy law. BIPA has been the law of Illinois since 2008. By the time Adobe launched the Firefly Speech Model and the Firefly Voice Model at Adobe MAX 2025, BIPA had produced some of the largest privacy settlements in American history: approximately $650 million in *In re Facebook Biometric Information Privacy*

*Litigation*, No. 3:15-cv-03747 (N.D. Cal.); approximately $100 million in *In re Google Inc. Biometric Information Privacy Litigation*, No. 1:20-cv-04472 (N.D. Ill.); and approximately $92 million in *In re TikTok, Inc., Consumer Privacy Litigation*, No. 1:20-cv-04699 (N.D. Ill.). Parallel state biometric statutes had produced additional billion-dollar settlements: Texas's $1.4 billion settlement with Meta in 2024 and Texas's $1.375 billion settlement with Google in 2025.

64. Voice-AI-specific litigation against companies in Adobe's product market had sharpened the notice. In May 2024, voice actors filed *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y.), alleging that an AI voice company commercialized unauthorized voice clones trained on the plaintiffs' recordings. In August 2024, additional voice actors filed *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del.), asserting analogous claims. By October 2025, when Adobe launched the Firefly Speech Model and the Firefly Voice Model at Adobe MAX, AI voice companies were active defendants in litigation alleging precisely the conduct alleged here: building commercial voice synthesis products on voice recordings ingested without speaker consent.

65. Adobe's compliance infrastructure foreclosed any claim of inadvertence. Adobe operates an internal AI Ethics Review Board through which, on Adobe's Chief Trust Officer's representation to the United States Senate, "every single AI feature that goes to market" must pass before launch. Adobe operates an AI Ethics Impact Assessment process applied to new generative-AI features. Adobe maintains an in-house Chief Trust Officer, an Office of the General Counsel, and a privacy and compliance function with

decades of experience in the technology industry. Adobe's Privacy Policy, as alleged at ¶¶ 45-46, expressly identifies "voiceprints" as a category of "sensitive personal information" Adobe collects.

66. Adobe knew what a voiceprint was. Adobe knew it was sensitive. Adobe knew the law required permission. Adobe knew voice-AI companies were being sued. Adobe knew BIPA imposed notice, consent, and written-release obligations that ran to the speakers whose voiceprints Adobe extracted. Adobe shipped the Firefly Speech Model and the Firefly Voice Model anyway.

*Adobe's First Extraction: Training the Foundational Models*

67. Adobe did not source these recordings blind. On information and belief, Adobe sourced voice recordings for its foundational voice training pipeline by accessing audio content created by specific, identifiable speakers on publicly accessible platforms — YouTube, Spotify, Apple Podcasts, Audible, Apple Books, Libro.fm, and analogous services — rather than (or in addition to) purchasing pre-cleared anonymized datasets from third-party intermediaries. The platforms display creator profiles that include the creator's name, geographic location, channel or artist description, and content catalog. The recordings come tagged with their origin. Adobe acquired voice recordings tagged, on their face, to identifiable speakers in identifiable places, including Illinois.

68. The training corpora required to support the Firefly Speech Model's library of more than seventy voices across more than twenty languages and the Firefly Voice Model's voice-preserving translation, dubbing, and lip-sync

capabilities are necessarily measured in tens of thousands of hours of speech from tens of thousands of distinct speakers. The Costin statement that Adobe "purchased music and voice from IP owners" cannot, on its own, account for a training corpus of that scale. On information and belief, Adobe's voice training corpora aggregate licensed voice-talent recordings, content sourced from publicly accessible audio platforms, and other audio sources not yet publicly identified by Adobe.

*Adobe's Second Extraction: Runtime Capture from User Uploads*

69. The biometric processing that occurs in Adobe's consumer-facing voice features — Generate Speech, Translate Video, Translate Audio, the Translate and Lip Sync API, and Enhance Speech — is the same category of processing that occurs during foundational model training. The consumer-facing features are applications of capabilities built during training. The training pipeline is where extraction of voiceprints and biometric information occurs first, at the largest scale, and on the broadest set of voice recordings. The runtime pipeline is where extraction occurs again — and to new speakers Adobe did not train on.

70. Adobe's Translate Video, Translate Audio, and Translate and Lip Sync products extract voiceprints and biometric information from voice recordings through a mechanism separate and independent from foundational model training. When an Adobe user uploads a video or audio file to one of these products, Adobe's Firefly Voice Model analyzes the recording, identifies the speaker or speakers in it, and extracts a representation of each speaker's

distinctive vocal characteristics. Adobe then uses that representation to synthesize translated speech in the same speaker's voice. Adobe describes the process in its own product documentation: the Firefly Voice Model "preserves voice characteristics including tone, cadence, and acoustic qualities" of the input speaker, and "recognizes speech and translates it into a different language while matching the original speaker's voice."[17]

71. Adobe's runtime extraction is, in both function and substance, the collection of a voiceprint and biometric information within the meaning of BIPA. The acoustic representation Adobe extracts from each input speaker is biologically and behaviorally unique to that speaker; it is the representation that allows Adobe's pipeline to reproduce that speaker's voice in a different language. Whether Adobe stores the representation persistently, transiently, or as parameters of a per-job model, the extraction itself is the collection event that triggers BIPA's notice, consent, and written-release obligations under § 15(b). Each upload to Translate Video, Translate Audio, or the Translate and Lip Sync API that captures one or more speakers triggers an extraction event with respect to each speaker. Each extraction event is a discrete collection.

72. The subject whose biometric data is collected through Translate Video, Translate Audio, and Translate and Lip Sync is the speaker in the

---

[17] Adobe, *AI Dubbing for video localization*, Adobe Firefly, https://www.adobe.com/products/firefly/features/ai-dubbing.html (last visited on May 13, 2026).

uploaded recording, not the Adobe user who uploaded it. The two are frequently different people. An Adobe user who uploads a podcast episode to translate it for an international audience captures the voices of the podcast's host, guests, and any other speakers whose voices appear in the recording. An Adobe user who uploads a YouTube video, an audiobook excerpt, an interview clip, a documentary segment, or a recorded performance captures every voice present in that audio. None of the captured speakers contracted with Adobe. None received notice from Adobe. None executed a written release.

73. Adobe expressly disclaims any role in obtaining the consent of third parties whose voices are captured in user-uploaded content. Adobe's Privacy Policy states: "In certain instances, Adobe is acting only on your behalf for personal information collected and processed by our services. ... If you submit any information relating to other people to us ... in connection with your use of Adobe apps or websites, you represent that you have the authority to do so and to permit us to use the information in accordance with this policy." By that disclaimer, Adobe attempts to delegate to its uploading users the duty to obtain consent from the speakers whose voices the uploads contain. Under BIPA, the duty to provide written notice and obtain written release runs to Adobe as the entity making the collection. Adobe cannot delegate the duty to a third party by contract. Adobe's attempt to do so is itself probative of Adobe's knowledge that the runtime extraction collects biometric data requiring consent.

74. Plaintiffs' recordings are widely and continuously distributed across publicly accessible platforms. On information and belief, Adobe users have uploaded recordings containing Plaintiffs' voices to Translate Video, Translate Audio, and the Translate and Lip Sync API since those products launched. Each upload triggered an independent runtime extraction of a Plaintiff's voiceprint — without notice, without consent, without a written release.

75. Adobe's runtime-extraction theory is independent of, and supplementary to, the foundational-training-data theory. Adobe's runtime extraction occurs every time a user submits a translation or lip-sync request that includes audio featuring one or more speakers, on a per-recording, per-speaker basis, regardless of whether Adobe's foundational voice models were also trained on the same source material. Adobe's runtime-extraction obligations under BIPA arise at each extraction event, independently of any obligations arising from foundational training.

*Adobe's BIPA Non-Compliance*

76. Adobe's privacy disclosures are directed at users of its platform. They do not address, and they cannot provide notice or consent on behalf of, non-users like Plaintiffs whose voices were ingested from third-party sources without any direct interaction with Adobe.

77. With respect to Plaintiffs, who never interacted with Adobe in connection with the collection of their voiceprints, Adobe's privacy policy is entirely inapplicable. Plaintiffs never read or agreed to any Adobe privacy

policy. Plaintiffs never received any disclosure from Adobe. Adobe provided no notice of any kind to Plaintiffs before collecting their voiceprints and biometric information through training-data ingestion or through runtime extraction.

78. Adobe's consent mechanism for platform users consists of general terms-of-service acceptance and product-level feature toggles. No separate consent mechanism specifically addressing biometric data, as distinct from general terms acceptance, has been publicly identified for the foundational voice training pipeline. With respect to Plaintiffs, who are not Adobe platform users, no consent of any kind was obtained.

79. Adobe's Privacy Policy contains a deletion provision tied to the disabling of consumer-facing features: "Where we process biometric identifiers or biometric information to deliver a feature requested by you, we delete this information once you turn off the feature, unless otherwise specified in the Software or Services." That provision is facially inapplicable to Plaintiffs and the Class. Plaintiffs and the Class are not Adobe platform users, have no relationship with Adobe to terminate, have no feature toggle to disable, and have no account through which to make a deletion request. No retention or destruction policy applicable to non-user training-data subjects or non-user runtime-extraction subjects has been publicly identified.

80. Adobe's general terms of service and Generative AI User Guidelines govern user-uploaded content and user-generated outputs. Neither addresses the disposition of voiceprints and biometric information extracted from voice recordings used to train Adobe's foundational voice synthesis models, or

extracted at runtime from speakers captured in user-uploaded recordings. The question whether biometric characteristics extracted from training-data voice recordings are ever destroyed, or whether they persist indefinitely in the parameters of Adobe's commercial models, is not addressed in any policy Adobe has published.

81. On information and belief, Adobe shares voice data, including voiceprints and biometric information, with affiliates, vendors, and service providers across jurisdictions. Adobe's Privacy Policy identifies the United States and India as the principal locations where Adobe processes personal information, and discloses that Adobe transfers personal information to other countries where Adobe and its affiliates, providers, and partners operate. Adobe's Privacy Policy further provides for disclosure of personal information to "other companies in the Adobe family" and to "service providers" and "data processors." Plaintiffs and the Class did not consent to any of these disclosures.

82. No mechanism exists by which non-users, including Plaintiffs and the Class, can request access to, correction of, or deletion of their biometric data from Adobe's training datasets, model parameters, runtime processing systems, or affiliate, vendor, or service-provider transfers.

*Illinois-Origin Biometric Data*

83. Plaintiffs' voices, the biological characteristics from which their voiceprints are derived, were produced by Plaintiffs while they were physically present in Illinois. The audio recordings embodying Plaintiffs' voices were

created in Illinois. The recordings were published from Illinois to publicly accessible platforms, on which Plaintiffs display their names, professional biographies, and content catalogs, and on which Plaintiffs' association with Illinois as a production location is publicly visible.

84. The biometric data at the center of this case originated in Illinois on three independent grounds.

(a) The data was generated in Illinois. Plaintiffs' voices, the biological source from which voiceprints are derived, are produced in Illinois every time Plaintiffs speak in their professional capacity. The audio encodings of those voices, the recordings from which Adobe extracted voiceprints, were created in Illinois.

(b) Adobe's acquisition was targeted at identifiably Illinois-origin material. Adobe affirmatively accessed publicly available platforms and sourced voice recordings from them. The recordings Adobe acquired were published with metadata identifying the speaker by name and identifying Illinois as the location of production. Adobe's act of accessing and processing those recordings was the targeted acquisition of identifiably Illinois-origin biometric material from identifiable Illinois speakers, not the passive receipt of an anonymized dataset from a third-party intermediary.

(c) The ongoing exploitation is directed at Illinois. Adobe possesses, uses, and profits from voiceprints derived from Illinois-recorded voice work. Adobe markets, sells, and delivers commercial voice products powered by those voiceprints to Illinois customers on a recurring subscription basis. Adobe's

commercial monetization of the Illinois-origin biometric data continues, day after day, in Illinois.

85. BIPA's duties run to the subjects of the biometric data. Section 15(b) requires the collecting entity to inform "the subject" in writing and receive "a written release executed by the subject" before collection. 740 ILCS 14/15(b). Section 15(a) imposes retention and destruction duties owed to the persons whose data is held. Section 15(c) prohibits profiting from those persons' data. Section 15(d) prohibits its dissemination. Section 15(e) requires its protection on terms at least as protective as the entity applies to its own confidential information. The subjects of the biometric data are Plaintiffs. The duties were owed to Illinois persons. The failures were failures with respect to Illinois persons. The continuing violations — the retention, the monetization, the cross-jurisdictional transfer, the substandard protection — are continuing violations against Illinois persons whose voices originated in Illinois.

*Adobe Monetizes Illinois-Origin Voiceprints*

86. The acts that give rise to Plaintiffs' claims are stages in a single, integrated commercial chain designed to extract commercial value from Plaintiffs' biometric data and deliver that value to Adobe through paying Illinois customers. Adobe collected voiceprints from Plaintiffs' voice recordings. Adobe used those voiceprints to train the Firefly Speech Model and the Firefly Voice Model. Adobe deployed those models to power Generate Speech, Translate Video, Translate Audio, the Translate and Lip Sync API, and the Enhance Speech feature. Adobe sells and delivers those products to customers,

including Illinois customers, through subscription plans, enterprise licenses, and developer APIs. Each stage depends on the one before it. Without extracting biometric data from training recordings and from user-uploaded runtime recordings, Adobe's voice models would lack the voice quality, expressiveness, and multilingual capability that Adobe's customers pay for.

87. Adobe monetizes Plaintiffs' voiceprints through at least five distinct commercial channels:

(a) Firefly Standard and Firefly Pro subscription fees, under which Generate Speech is offered as a premium feature with commercial-use rights to outputs;

(b) Creative Cloud subscription fees across Single App, All Apps, Pro, Teams, and Enterprise tiers, under which subscribers receive access to Adobe's voice products as part of their broader Creative Cloud entitlements;

(c) enterprise Creative Cloud, enterprise voice product, and Translate and Lip Sync API licensing fees, under which enterprise customers receive expanded voice product capabilities, higher usage limits, and direct API access;

(d) Firefly Services API and other developer-platform revenue tied to Adobe's voice models; and

(e) partnership and platform value Adobe extracts by integrating partner voice models, including ElevenLabs' Multilingual v2, into the Generate Speech surface alongside Adobe's own Firefly Speech Model — positioning Adobe as a voice-AI platform aggregator rather than only a voice-AI model provider.

88. Adobe's fiscal-year 2025 Digital Media Annualized Recurring Revenue of approximately $18.59 billion derives in material part from the integrated commercial chain that monetizes the voiceprints at issue in this lawsuit. The voice quality, expressiveness, speaker similarity, and multilingual capability that Adobe's Illinois customers pay for through each of the channels enumerated above are capabilities that exist because of the voiceprints encoded in Adobe's foundational voice models. On information and belief, those voiceprints include biometric data Adobe extracted from voice recordings produced or recorded in Illinois.

*Adobe's Products Compete With the People Whose Voices Built Them*

89. Adobe's commercial voice products directly serve and threaten the professional markets in which Plaintiffs and Class members earn their livelihoods, including audiobook narration, voice acting, podcast hosting and narration, film and television dubbing, advertising voiceover, broadcast and audio journalism, e-learning narration, and related markets for professional voice work.

90. Adobe markets its commercial voice products as cost-effective substitutes for professional voice services. Adobe promotes Generate Speech to creators who, Adobe tells them, no longer need "separate text-to-speech software" or "a high quality microphone," with downloadable WAV outputs cleared for commercial use. Adobe characterizes the AI dubbing capabilities of Translate Video, Translate Audio, and the Translate and Lip Sync API as

"significantly reducing production time and costs" relative to retaining voice actors to record new dialogue.

91. Adobe trained its commercial voice products on the voices of professional narrators, journalists, podcasters, and voice actors. Adobe now sells those products into the markets where those professionals make their living. Adobe undercuts their rates with their own voices. On information and belief, the technology Adobe built using Plaintiffs' voiceprints and biometric information directly competes with Plaintiffs in their specific market niches: audiobook narration (Dorcus, Nassif), long-form investigative audio journalism (Flowers, Lacour, Amer), broadcast journalism and on-air reporting (Marin, Rogers), and authentic Arabic-accented narration of works by Arab and Palestinian American authors (Nassif). Plaintiffs and Class members have suffered, and continue to suffer, economic injury — lost and diminished licensing income, suppressed voiceover and narration rates, diverted commercial opportunities, and loss of control over their biometric data and professional identities. The product with which Adobe competes against the Plaintiffs is built from the Plaintiffs' own voices.

*Named Plaintiffs*

*Allegations Common To All Plaintiffs*

92. On information and belief, the voice recordings of each named Plaintiff were among the audio that Adobe ingested to train its foundational voice models, and voiceprints derived from those recordings are encoded in the parameters of those models and reproduced in the audio those models

generate, including the Firefly Speech Model and Firefly Voice Model that power Adobe's commercial products. Each Plaintiff's catalog of professional voice work matches the profile of training audio optimal for foundational voice models of the type Adobe develops: long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source, and continuously available on the publicly distributed audio platforms — broadcast archives, podcast directories, audiobook platforms, video platforms — from which AI voice companies have been alleged to source training data, including in *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del.) (against the AI voice company whose Multilingual v2 model Adobe has integrated directly into Generate Speech). Each platform on which a Plaintiff's catalog is publicly accessible carries metadata explicitly identifying the Plaintiff by name and Illinois as the production location, so Adobe's acquisition could not have been the passive receipt of an anonymized dataset and necessarily involved acquiring biometric data tied to an identified Illinois speaker producing work in Illinois. Adobe's foundational voice models, which Adobe markets as covering more than twenty languages with a library of more than seventy voices, cannot have been produced without ingesting hundreds of thousands of hours of voice recordings from identifiable speakers, and Adobe has never publicly identified the sources, scale, or provenance of that data — facts within Adobe's exclusive control. Adobe has consistently characterized its voice models as "commercially safe" and trained on "licensed" or "responsibly sourced" content while declining to identify the licenses, sources, or rights-holders, mirroring representations

Adobe made about its image-model training data that investigative reporting in April 2024 established were incomplete with respect to that prior dataset.

93. No named Plaintiff created an Adobe account authorizing Adobe to use his or her voice, uploaded a voice recording to any Adobe platform for that purpose, invoked any Adobe voice-AI product, or accepted any Adobe terms of service related to its voice products. No Plaintiff received notice that Adobe had collected his or her voiceprint, received any disclosure of the purpose or duration of that collection, or executed a written release. Adobe's collection of each Plaintiff's voiceprint, and Adobe's continuing possession and commercial exploitation of that voiceprint, occurred and continues without that Plaintiff's knowledge or consent. The records identifying which specific voice recordings Adobe ingested are within Adobe's exclusive control.

94. The injury Adobe inflicted on each named Plaintiff is concrete and particular and shares the same structure across all of them. Adobe extracted each Plaintiff's voiceprint from recordings the Plaintiff produced in Illinois, encoded that voiceprint in foundational voice models, and continues to profit from those models and the commercial products built on them — including Generate Speech, Translate Video, Translate Audio, the Translate and Lip Sync API, and the Enhance Speech feature. The voiceprint cannot be recovered or replaced; it is the same biological and behavioral signature the Plaintiff uses to speak. The commercial products Adobe built now operate in the same professional voice markets in which the Plaintiff built and, where applicable,

continues to build a career, in a competitive position the Plaintiff neither chose nor authorized.

*Carol Marin*

95. Plaintiff Marin is one of the most decorated broadcast journalists in American television history, with a career spanning nearly five decades in on-air television and radio journalism. Marin's voice-based and oral journalism work — spanning on-air television anchoring, investigative broadcast reporting, live debate moderation, documentary narration, and in-depth interviewing — has been disseminated across major broadcast and digital platforms including NBC (WMAQ-TV), CBS News (60 Minutes, 60 Minutes II, CBS Evening News), WTTW (Chicago Tonight), CNN, and the Discovery Channel. Marin's career has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, at least fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, the Sigma Delta Chi Ethics in Journalism Award, induction into the Chicago Journalism Hall of Fame, and, in 2025, the Order of Lincoln — the State of Illinois's highest civilian honor.

96. A substantial archive of Marin's on-air broadcast journalism is publicly available through the Media Burn Archive (mediaburn.org), a nonprofit digital archive in Chicago that preserves her broadcast investigative reporting, documentary work, and on-air interviews. Marin's work is also accessible through the WTTW digital archive (news.wttw.com), the NBC Chicago digital archive (nbcchicago.com), and on YouTube, where her Peabody acceptance

speeches, debate moderation, and archived broadcast segments are publicly available. Marin's voice, the biological characteristic from which a voiceprint is derived, was produced by Marin while she was physically present in Illinois; the audio recordings embodying Marin's voice were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Marin's identity and her Illinois production location were publicly displayed.

*Philip Rogers*

97. Plaintiff Rogers is a retired, award-winning broadcast journalist whose career spans more than four decades in radio and television news. Rogers's voice-based and oral journalism work — spanning on-air radio reporting at WBBM Newsradio (CBS), on-air television reporting and anchoring at WMAQ-TV (NBC 5), and live broadcast coverage from conflict zones, disaster scenes, mass shootings, corruption trials, the Olympic Games, and other major national and international events — has been disseminated across major broadcast platforms including NBC (WMAQ-TV) and WBBM Newsradio (CBS), as well as digital platforms including the NBC Chicago online archive and YouTube. Rogers's career has been recognized with a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, multiple Peter Lisagor Awards from the Chicago Headline Club, and additional Emmy Awards.

98. A substantial archive of Rogers's on-air broadcast journalism is publicly available through the NBC Chicago digital platform at nbcchicago.com, where his on-air reports, investigative segments, and broadcast news stories

are archived and searchable. Rogers's work is also accessible on YouTube, including a career-retrospective interview conducted by the Illinois News Broadcasters Association. Rogers's voice, the biological characteristic from which a voiceprint is derived, was produced by Rogers while he was physically present in Illinois; the audio recordings embodying Rogers's voice were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Rogers's identity and his Illinois production location were publicly displayed.

*Alison Flowers*

99. Plaintiff Flowers is an award-winning investigative journalist, podcast producer, and audio storyteller based in Chicago. Flowers is the founder of Spiralbound, a production company operating at the intersection of investigative journalism and immersive storytelling, and previously served as the Head of Production at the Invisible Institute, a nonprofit investigative journalism organization on the South Side of Chicago. Flowers produced and reported the seven-part investigative podcast Somebody (2020), which was a 2021 Pulitzer Prize finalist for Audio Reporting, won the National Magazine Award (Ellie) for Podcasting, the Scripps Howard Award, the IDA Best Audio Documentary, a National Headliner Award, a Gracie Award, and the 2020 Third Coast International Audio Festival Best Serialized Story; Rolling Stone named Somebody to its list of "The 25 Best True-Crime Podcasts of All Time" and ranked it #1 on its Best Podcasts of 2020 list, and The New York Times ranked it #1 on its list of true crime podcasts at the intersection of race.

100. Flowers's voice-based and oral journalism work has been disseminated across all major digital audio platforms, including Apple Podcasts, Spotify, iHeartRadio, YouTube, and Stitcher. Somebody was also distributed via Google Podcasts prior to that service's discontinuation in 2024 — meaning Flowers's voice work was, during the relevant period, distributed through an audio platform operated by a company that itself has been the subject of public allegations of large-scale ingestion of publicly distributed audio content for AI training purposes. Flowers's voice, the biological characteristic from which a voiceprint is derived, was produced by Flowers while she was physically present in Illinois; the audio recordings embodying Flowers's voice were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Flowers's identity and her Illinois production location were publicly displayed.

*Robin Amer*

101. Plaintiff Amer has more than twenty years of experience in digital, broadcast, and print media. Amer is the creator, host, narrator, and showrunner of USA Today's investigative podcast The City — which peaked at #6 on the Apple Podcasts charts, was named Best Podcast of the Year by The New Yorker, The New York Times, Quartz, and Apple Podcasts, and was distributed across Apple Podcasts, Spotify, iHeartRadio, and Google Podcasts prior to that service's discontinuation in 2024. Amer's earlier audio production contributions to the podcast Gravy helped that program win the 2015 James Beard Award for Best Podcast. Amer spent three years at The Washington Post

as Senior Producer for Audio Features, where she edited Post Reports and the standalone narrative podcast series Field Trip, and won or was a finalist for the Alfred I. duPont–Columbia University Award for three consecutive years. Amer currently serves as the Managing Editor of Love + Radio, which has been described by The Guardian as one of the greatest podcasts of all time, and oversaw production of the podcast's Blood Memory, which won the 2025 Tribeca Festival Audio Storytelling prize for Best Independent Non-Fiction.

102. Amer's voice-based and oral journalism work has been disseminated across major digital audio platforms including Apple Podcasts, Spotify, iHeartRadio, Amazon Music, YouTube, and WBEZ/NPR. The City and Amer's other podcast work were also distributed via Google Podcasts prior to that service's discontinuation in 2024. Amer's voice, the biological characteristic from which a voiceprint is derived, was produced by Amer while she was physically present in Illinois during the substantial majority of her recording work; the audio recordings embodying Amer's voice were primarily and substantially created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Amer's identity and her Illinois production location were publicly displayed.

*Lindsey Dorcus*

103. Plaintiff Dorcus is an established and professionally recognized voice actor, audiobook narrator, and voiceover artist whose voice-based creative work has been commercially released by most major book publishers in the English-speaking world and distributed across all major audiobook and

digital audio platforms. Dorcus has recorded more than 200 audiobooks for major publishers including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. Dorcus is a 2020 Society of Voice Arts and Sciences (SOVAS) Voice Arts Award winner (full-cast voice artist ensemble for the audiobook anthology Wild Monsters Dance About: Stories from an Unruly Mind), a 2021 Independent Audiobook Award winner for LGBTQ+ audiobook narration, and the subject of favorable reviews in AudioFile Magazine, which has described her performances as "silky," "joyful," and capable of "drawing listeners in with the haunting cadence of her voice."

104. Dorcus's audiobook narration is publicly available and distributed across the major audiobook and digital audio platforms, including Audible, Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, Scribd/Everand, and other major audiobook retailers and subscription services. Dorcus's complete catalog of narrated titles is searchable and accessible on Audible.com and other major audiobook platforms. Dorcus's audiobooks are distributed in part through Google Play Books — meaning Dorcus's voice work is, during the relevant period, distributed through an audiobook platform operated by a company that itself has been the subject of public allegations of large-scale ingestion of publicly distributed audio content for AI training purposes. Dorcus possesses a professionally recognized range of accents and dialects including General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (Dublin and Northern), French, American Southern, Greek, New

England, New York, German, Indian, and Russian. Dorcus operates a professional home recording studio in Chicago equipped with industry-standard audiobook production equipment, and all of Dorcus's audiobook work has been recorded at studios, including her home, in the City of Chicago. Dorcus's voice, the biological characteristic from which a voiceprint is derived, was produced by Dorcus while she was physically present in Illinois; the audio recordings embodying Dorcus's voice were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Dorcus's identity and her Illinois production location were publicly displayed.

*Yohance Lacour*

105. Plaintiff Lacour is a writer, journalist, audio storyteller, playwright, and entrepreneur from the South Side of Chicago who has dedicated his professional work to telling stories of Black Chicago. Lacour is the creator, host, writer, and lead reporter of the seven-part investigative and memoir podcast You Didn't See Nothin', a production of the Invisible Institute and USG Audio. In 2024, You Didn't See Nothin' was awarded the Pulitzer Prize for Audio Reporting and a Peabody Award; the series was also named among Apple Podcasts' "Podcasts We Love" and recognized as one of the "100 Best Podcasts of All Time," and received four nominations at the Black Podcasting Awards and two nominations at the Signal Podcasting Awards. Lacour serves as the on-air voice, narrator, and lead reporter throughout the series, conducting recorded interviews and providing oral narration. Lacour is affiliated with the

Invisible Institute, a nonprofit investigative journalism organization based on the South Side of Chicago.

106. You Didn't See Nothin' is publicly available and distributed across all major podcast and digital audio platforms, including Apple Podcasts, Spotify, iHeart Podcasts, YouTube, Amazon Music, and Overcast. Lacour has also appeared as a featured guest and interview subject on nationally distributed audio journalism programs discussing You Didn't See Nothin' and his work as a journalist and storyteller, including NPR's Fresh Air with Tonya Mosley, NPR's All Things Considered with Adrian Florido, the CBC's Crime Story podcast with Kathleen Goldhar, and the Pulitzer Prize Board's own Pulitzer on the Road podcast — interviews that are publicly available across major public radio and podcast distribution platforms. Lacour's voice, the biological characteristic from which a voiceprint is derived, was produced by Lacour while he was physically present in Illinois; the audio recordings embodying Lacour's voice were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Lacour's identity and his Illinois production location were publicly displayed.

*Victoria Nassif*

107. Plaintiff Nassif is a first-generation Lebanese-Palestinian American professional actor, audiobook narrator, voiceover artist, and intimacy director based in Illinois. Nassif is a trained mezzo-soprano singer. Nassif has recorded audiobooks for major publishers including Penguin Random House (Random House Audio), Hachette Book Group (Little, Brown Young Readers), and Simon

& Schuster. Nassif's notable audiobook narration credits include The Next New Syrian Girl by Ream Shukairy (Hachette/Little, Brown Young Readers), for which she served as the solo narrator performing multiple characters with authentic Arabic accents in the Levantine dialect; The Skin and Its Girl by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist that was shortlisted for the Ursula K. Le Guin Prize and named a Them Best Book of the Year; Gulf by Mo Ogrodnik (Simon & Schuster); The Jasad Crown by Sara Hashem; and Every Moment is a Life, a bilingual Arabic-English anthology compiled by Susan Abulhawa featuring stories from Palestinian writers. Nassif has performed on-camera in broadcast television, including multiple episodes of Chicago PD (NBC, Season 12), and has appeared in nationally broadcast commercials. Nassif possesses a professionally recognized range of accents and dialects including General American, British (Received Pronunciation and Cockney), Persian, Levantine Arabic, and American Southern. As a first-generation Lebanese-Palestinian American who speaks basic Arabic, Nassif brings native cultural and linguistic authenticity to her narration of works featuring Middle Eastern and Arab characters and settings — a distinctive professional asset in the audiobook narration industry.

108. Nassif's audiobook narration is publicly available and distributed across major audiobook and digital audio platforms, including Audible, Apple Books, Spotify, Libro.fm, and other major audiobook retailers and subscription services. Nassif's voice, the biological characteristic from which a voiceprint is

derived, was produced by Nassif while she was physically present in Illinois; the audio recordings embodying Nassif's voice were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Nassif's identity and her Illinois production location were publicly displayed.

*Adobe Acted Willfully and Recklessly*

109. Adobe did not stumble into this. Adobe extracted Plaintiffs' voiceprints with full knowledge of BIPA, full knowledge of the technology, full knowledge of how to obtain consent, and full knowledge that the AI voice industry was being sued for precisely the conduct alleged here. Adobe extracted them anyway. That was not inadvertence. It was choice.

*Adobe knew the Law*

110. The law was not obscure. BIPA has been on the books since 2008 and has produced some of the largest privacy settlements in American history, as alleged at ¶ 63. Voice-AI defendants have been litigating analogous claims for two years, as alleged at ¶ 64. Adobe's Privacy Policy, last updated four days before the launch of the Firefly Speech Model and the Firefly Voice Model, expressly enumerates "voiceprints" among the "biometric identifiers" Adobe collects, as alleged at ¶¶ 45-46. Adobe operates an AI Ethics Review Board through which, on Adobe's Chief Trust Officer's sworn representation to the United States Senate, "every single AI feature that goes to market" must pass before launch, as alleged at ¶ 49, 65. A company with that infrastructure, that policy language, and that record cannot credibly claim it was unaware of BIPA's requirements.

*Adobe Knew the Technology*

111. Adobe wrote the papers and recruited the people. Adobe Research has been publishing on speaker-identity extraction since 2017 and demonstrating voice-cloning capabilities under its own brand since 2016, as alleged at ¶¶ 37-39, 44. Adobe's product documentation describes the Firefly Voice Model as "matching the original speaker's voice" and "preserving voice characteristics including tone, cadence, and acoustic qualities" — descriptions that depend, as a technical matter, on the extraction of speaker-identifying representations from input audio. Adobe Research also recruited the technical leadership of competing voice-cloning programs, including Rithesh Kumar, who joined Adobe Research from Descript Inc., where he had served as Technical Lead for Descript's Overdub voice-cloning feature — technology Descript acquired through its 2019 purchase of Lyrebird, an early voice-cloning startup. Adobe did not enter voice synthesis cold. Adobe could not credibly plead that its own pipeline does not extract speaker-identifying representations from the audio it ingests.

*Adobe Knew How to Obtain Consent*
*and Chose Not to Obtain It Here*

112. Adobe operates contemporaneous consent and compensation frameworks for three categories of training-data subjects: Adobe Stock contributors (¶ 59), the public-figure voices distributed through ElevenLabs' Iconic Marketplace and shipped inside Adobe's own product interface (¶ 60), and the music-industry rights holders whose recordings train Adobe's Firefly Audio Model (¶ 61). Three frameworks, three categories, contemporaneous with

the launch of the Firefly Speech Model. Adobe built none of them for the broadcast journalists, podcasters, audiobook narrators, and voice actors whose recordings, on information and belief, trained that model.

113. The omission was a calculation. BIPA-compliant collection would have required Adobe to identify the source speakers, provide written notice of the specific purpose and duration of collection, and obtain a written release from each speaker before ingestion. The training corpora behind the Firefly Speech Model's library of more than seventy voices across more than twenty languages comprise, on information and belief, the recordings of hundreds of thousands of distinct speakers. That compliance burden would have constrained the speed and scale of Adobe's voice AI development. Adobe chose speed and scale. Adobe added voice synthesis to a product portfolio generating approximately $23.77 billion in fiscal-year 2025 revenue on that choice. That was not an oversight. It was a business decision.

*Adobe Spent Nine Years Mitigating Voice-Synthesis Risk Without Resolving the Consent Problem*

114. Adobe's conduct between 2016 and 2025 confirms that it recognized the privacy and ethical risks of commercial voice synthesis from the start. Adobe declined to release Project VoCo as a product in 2016–2018, with Adobe's researchers publicly acknowledging misuse risks and stating they were working in parallel on watermarking to make synthesized speech detectable. Adobe co-founded the Content Authenticity Initiative in 2019. Adobe co-founded the Coalition for Content Provenance and Authenticity in 2021. Adobe published the *MaskMark* neural-watermarking research in 2024, expressly

framed as applicable to "Real and Synthetic Speech." Each step addressed a downstream risk Adobe itself recognized in the productization of voice synthesis. When Adobe finally shipped voice synthesis at commercial scale at Adobe MAX 2025, it shipped with provenance markings, with watermarking research in hand, and with "commercially safe" marketing language — and without any consent infrastructure for the speakers whose voices populated the training corpus. Adobe spent nine years mitigating the symptoms. Adobe never addressed the cause.

*Adobe's Parallel Training-Data Conduct Confirms the Pattern*

115. Adobe's noncompliance is not isolated to voice. In December 2025, an Oregon-resident author filed a putative class action in *Lyon v. Adobe Inc.*, No. 5:25-cv-10732 (N.D. Cal.), alleging that Adobe trained its SlimLM small-language-model series on copyrighted books obtained without authorization through third-party datasets including SlimPajama and the Books3 corpus. A second putative class action alleging analogous AI training-data practices was reported filed in February 2026. In April 2024, Bloomberg established that Adobe's analogous "licensed" and "commercially safe" representations about its image-model training data did not match the underlying practice, as alleged at ¶¶ 55-57. Across image, language, and voice, the institutional pattern is the same: conclusory licensure language; refusal to identify sources; non-consensual ingestion at scale.

116. Each of the violations alleged in this Complaint was therefore committed by Adobe with knowledge of, or in reckless disregard for, BIPA's

requirements. Plaintiffs are entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(2), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(1), recoverable on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay*.

## CLASS ACTION ALLEGATIONS

117. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings Adobe collected, captured, extracted, derived, or otherwise obtained voiceprints or biometric information in connection with (i) the development, training, fine-tuning, evaluation, or operation of any Adobe voice synthesis, voice recognition, or related voice-AI model, including but not limited to the Firefly Speech Model, the Firefly Voice Model, and any predecessor, successor, derivative, or fine-tuned version of those models, or (ii) the runtime processing of voice recordings submitted to any of Adobe's commercial voice products, including without limitation Translate Video, Translate Audio, Translate and Lip Sync, and Enhance Speech, during the Class Period.

118. The Class Period runs from the earlier of (a) the date Adobe first ingested any voice recording into the training pipeline for any of its foundational voice synthesis models, or first extracted voice characteristics from any recording submitted to its runtime-extracting voice products, or (b)

January 1, 2016, through the date of judgment. Discovery will establish the operative start date.

119. Excluded from the Class are: (i) Adobe Inc. and each of its parents, subsidiaries, affiliates, and controlled entities; (ii) all current and former officers and directors of Adobe; (iii) Adobe's current and former employees, contractors, and agents during the Class Period, and counsel of record in this action; (iv) the Court, the Court's staff, and any jurors assigned to this action; (v) immediate family members (defined as spouses, domestic partners, parents, children, and siblings) of any individual excluded under clause (ii); (vi) the United States, the State of Illinois, and their respective subdivisions, agencies, and instrumentalities; and (vii) any person who executed a written release authorizing Adobe to collect, capture, or obtain their voice recordings for the specific purpose of training, evaluating, or operating Adobe's voice synthesis or voice recognition models.

120. No person is excluded from the Class by reason of having released, settled, or otherwise resolved claims arising out of separate facts or transactions, including without limitation claims arising from Adobe's training of language models or image generation models.

121. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

122. *Ascertainability.* Class membership is defined by objective criteria. Whether a particular voice recording entered Adobe's training pipeline, or was processed by Adobe's runtime-extracting voice products, is a binary factual question, and the records that answer it — training-data manifests, ingestion logs, source-URL records, dataset-version records, runtime request logs, per-job processing records, speaker-embedding indices, and associated speaker- and file-level identifiers — are within Adobe's exclusive control. Class membership can be further confirmed through publicly available distribution metadata (audiobook platform records, podcast directory records, streaming service catalogs, broadcast archive records) and through voice-matching analysis comparing Adobe's voice model outputs against publicly available recordings of Class members.

123. *Numerosity.* Joinder is impracticable. Fed. R. Civ. P. 23(a)(1). On information and belief, the number of speakers whose Illinois-recorded voice work was ingested into Adobe's training pipelines, or processed by Adobe's runtime-extracting voice products, runs to the hundreds of thousands. Building voice synthesis models of the multilingual capability for which Adobe markets the Firefly Speech Model and Firefly Voice Model — supporting more than twenty languages and a library of more than seventy voices — requires training on a correspondingly large and diverse speaker population. The Class includes (a) the broadcast journalists, podcasters, audiobook narrators, voice actors, voiceover artists, and other professional voice talent who produced work in Illinois during the Class Period; (b) the interview subjects, guests, panelists,

witnesses, callers, public officials, and other speakers whose voices were captured in Illinois-produced or Illinois-recorded audio content publicly accessible on the platforms from which, on information and belief, Adobe sourced training data; and (c) every Illinois-recorded speaker — professional or incidental — whose voice was captured in audio submitted to Adobe's Translate Video, Translate Audio, or Translate and Lip Sync services during the Class Period. The exact number is within Adobe's exclusive control and will be established through discovery.

124. *Commonality.* Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). Adobe did not engage in any individualized notice, consent, retention-policy disclosure, written-release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into Adobe's training pipelines or whose voice characteristics were extracted at runtime by Adobe's voice products. The same training pipelines and the same runtime extraction pipelines processed the same categories of voice recordings under the same absent-consent posture, applied to every Class member through the same automated and standardized processes. The questions whether Adobe complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and biometric-data-protection requirements can be answered classwide because Adobe's noncompliance was identical as to every Class member.

125. Common questions of law and fact include, without limitation:

(a) whether the computational representations of vocal characteristics Adobe extracts during voice-model training, including the speaker embeddings and speaker-acoustic representations described in Adobe Research's published papers and Adobe's product documentation, constitute "voiceprints" or "biometric information" within the meaning of BIPA;

(b) whether the per-job voice-characteristic representations Adobe extracts at runtime when Translate Video, Translate Audio, and Translate and Lip Sync process user-submitted recordings — representations Adobe's own product documentation describes as "preserv[ing] voice characteristics including tone, cadence, and acoustic qualities" of the input speaker — constitute "voiceprints" or "biometric information" within the meaning of BIPA;

(c) whether Adobe informed Class members in writing that their biometric identifiers were being collected or stored, of the specific purpose and length of term of collection, and obtained a written release, as 740 ILCS 14/15(b) requires;

(d) whether Adobe developed and made publicly available a written retention and destruction policy applicable to Class members' biometric identifiers, as 740 ILCS 14/15(a) requires;

(e) whether Adobe sold, leased, traded, or otherwise profited from Class members' biometric identifiers in violation of 740 ILCS 14/15(c);

(f) whether Adobe disclosed, redisclosed, or otherwise disseminated Class members' biometric identifiers — including through transfers to Adobe's affiliates, vendors, and service providers, and to its data-processing operations

in the United States and India — without consent and outside any enumerated exception, in violation of 740 ILCS 14/15(d);

(g) whether Adobe stored, transmitted, and protected Class members' biometric identifiers using the reasonable standard of care required by 740 ILCS 14/15(e)(1) and in a manner equally or more protective than its protection of other confidential and sensitive information — including its source code, proprietary architecture, internal financial records, and customer data — as 740 ILCS 14/15(e)(2) requires;

(h) whether Adobe's conduct was willful or reckless within the meaning of 740 ILCS 14/20(2);

(i) whether Adobe used Class members' voices and identities for commercial purposes without prior written consent in violation of 765 ILCS 1075/30(a);

(j) whether Adobe's voice products generate, distribute, or make available unauthorized digital replicas within the meaning of 765 ILCS 1075/30(b) and (d), as amended by P.A. 103-836, and whether Adobe materially contributes to or facilitates their distribution;

(k) whether Adobe's conduct constitutes unfair or deceptive practices under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2;

(l) whether Adobe's conduct constitutes deceptive trade practices likely to cause confusion in violation of 815 ILCS 510/2(a)(2) and (a)(3);

(m) whether Adobe was unjustly enriched by its unauthorized use of Class members' voice data; and

(n) the appropriate measures of damages, restitution, and injunctive relief.

126. *Typicality*. The named Plaintiffs' claims are typical of the Class's claims. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois — broadcast journalism, audio reporting, audiobook narration, podcast production, and related voice work recorded in Chicago studios, broadcast facilities, and home recording studios in this District. Adobe, on information and belief, ingested those recordings into the training pipelines for its foundational voice synthesis models and, on information and belief, has extracted voice characteristics from those recordings at runtime when users uploaded them to Translate Video, Translate Audio, or Translate and Lip Sync, in each case without notice, consent, or written release. The legal theories asserted on behalf of the Class apply with equal force to each named Plaintiff and to every other Class member.

127. *Adequacy*. Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the absent Class members; each named Plaintiff has the same incentive as every other Class member to maximize recovery and to obtain comprehensive injunctive relief. Plaintiffs are represented by counsel experienced in complex class action litigation, privacy

litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

128. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because Adobe has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. Adobe's training pipelines operated uniformly across every Class member's voice recordings; Adobe's runtime extraction pipelines operate uniformly across every voice captured in user-uploaded recordings; Adobe's failure to obtain BIPA-compliant consent was uniform; Adobe's failure to publish a retention and destruction policy applicable to non-user training-data subjects and non-user runtime-extraction subjects was uniform; and Adobe's continuing possession and commercial exploitation of Class members' voiceprints — encoded in the Firefly Speech Model and Firefly Voice Model that power Generate Speech, Translate Video, Translate Audio, Translate and Lip Sync, and Enhance Speech — is uniform. Plaintiffs seek classwide injunctive relief, including the destruction or retraining of the foundational voice synthesis models in which Class members' voiceprints are encoded, that necessarily applies on the same terms to every Class member.

129. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate on the damages and restitutionary claims, because common questions of law and fact predominate over questions affecting only individual

Class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

130. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. *First*, whether Adobe's voice-model training pipeline extracts voiceprints within the meaning of BIPA is a common technical question with a common answer: Adobe's product documentation describes the underlying processing as "preserv[ing] voice characteristics including tone, cadence, and acoustic qualities" of an input speaker, and Adobe's Privacy Policy expressly enumerates "voiceprints" among the categories of biometric identifiers Adobe collects. *Second*, whether Adobe's runtime extraction pipeline extracts voiceprints is the same common technical question, answered by the same Adobe-authored descriptions. *Third*, whether Adobe complied with BIPA's notice, consent, retention, profiting, dissemination, and biometric-data-protection requirements is a common legal question with a common answer: Adobe did not, with respect to any non-user. *Fourth*, whether Adobe's conduct was willful or reckless turns on Adobe's institutional knowledge and decision-making, which are common to the Class. The principal individual question — whether a specific Class member's voice recording entered the training pipelines or was processed at runtime — is binary and resolvable from Adobe's own records, including training-data manifests, ingestion logs, runtime request logs, per-job processing records, and source-identifier records in Adobe's exclusive control. Individual damages calculations under BIPA's per-person, per-subsection liquidated-damages framework, 740

ILCS 14/20, as amended by P.A. 103-769 and as construed in Clay v. Union Pacific Railroad Co., No. 25-2185 (7th Cir. Apr. 1, 2026), do not predominate over the common liability questions because the per-violation amounts are statutorily fixed.

131. *Superiority.* A class action is the superior method for adjudicating these claims.

(a) *Class members' interest in individual control.* Class members are voice professionals — broadcast journalists, audiobook narrators, podcasters, voiceover artists, voice actors — and incidental speakers whose voiceprints were extracted without their knowledge. Many remain unaware that their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against a major publicly traded technology company reporting approximately $23.77 billion in annual revenue, with statutory damages amounts that, while meaningful in the aggregate, are likely too modest in individual cases to justify the cost and burden of independent representation. A class action is the only realistic vehicle for redress.

(b) *Existing related litigation.* Two putative class actions are pending against Adobe arising from training-data practices: *Lyon v. Adobe Inc.*, No. 5:25-cv-10732 (N.D. Cal. filed Dec. 16, 2025), and a follow-on putative class action filed in February 2026. Both concern alleged training of Adobe's SlimLM small-language-model series on copyrighted books obtained without authorization through third-party datasets, and both assert claims on behalf of authors and copyright holders. Both are pending in a different district. Neither

asserts claims under BIPA, IRPA, or any analogous biometric-privacy or right-of-publicity statute, and neither concerns the voice professionals and incidental speakers whose voices were ingested into Adobe's foundational voice synthesis models or extracted at runtime by Adobe's commercial voice products. Analogous biometric-privacy and right-of-publicity allegations have been asserted against other AI voice companies, including *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024) (settled 2025), and *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y. filed May 16, 2024). No other putative class action known to Plaintiffs asserts BIPA, IRPA, or analogous Illinois claims against Adobe on behalf of the Illinois-recorded speakers whose voices were used to build and operate its commercial voice products.

(c) *Desirability of concentration in this forum.* Plaintiffs are Illinois residents whose recordings were produced or recorded in Illinois. The claims arise under Illinois statutes. The injuries were suffered in Illinois. Adobe conducts substantial commercial business in Illinois through Firefly Standard, Firefly Pro, Creative Cloud, enterprise, and API subscription sales of its voice products to Illinois customers. The Northern District of Illinois has substantial expertise with BIPA litigation and is the natural forum for adjudication of Illinois residents' Illinois-statutory claims arising from Adobe's commercial conduct in Illinois.

(d) *Manageability.* The case is manageable as a class action. Adobe's conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; Class membership can be

determined from Adobe's records, supplemented as needed by publicly available distribution metadata and voice-matching analysis; and BIPA's per-person, per-subsection liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim.

132. *Tolling and continuing violations.* To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by Adobe's concealment of its training-data sources and runtime-extraction practices, by Adobe's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that Adobe had ingested their recordings into its training pipelines or processed them at runtime, and by the continuing nature of Adobe's violations. Independently, each retention of the unlawfully obtained biometric data, each operation of the foundational voice models in which the unlawfully obtained biometric data is encoded, and each disclosure or transmission of that biometric data is a separate violation of BIPA under Cothron v. White Castle System, Inc., 216 N.E.3d 918 (Ill. 2023), each accruing a separate limitations period from the date of the discrete violative act.

## CLAIMS FOR RELIEF

### Count I

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)

*Brought on behalf of the Class*

133. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

134. Plaintiffs bring this Count individually and on behalf of the Class.

135. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to mean "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

136. Adobe is a "private entity" within the meaning of BIPA. 740 ILCS 14/10.

137. Adobe collected, captured, and otherwise obtained voiceprints and biometric information from Plaintiffs' and Class members' voice recordings through two distinct and independently sufficient mechanisms: (i) by ingesting voice recordings into the training pipeline for Adobe's foundational voice

synthesis models, including the Firefly Speech Model and the Firefly Voice Model, and extracting computational representations of the distinctive acoustic characteristics of those speakers' voices, as alleged at ¶¶ 67-68, 92-108; and (ii) by extracting voice characteristics at runtime, on a per-recording, per-speaker basis, from voice recordings submitted to Translate Video, Translate Audio, and Translate and Lip Sync, as alleged at ¶¶ 69-75. The resulting representations — described in Adobe's own product documentation as "preserv[ing] voice characteristics including tone, cadence, and acoustic qualities" of an input speaker and as "matching the original speaker's voice" — are voiceprints and biometric information within the meaning of BIPA.

138. Adobe did not, before extracting Plaintiffs' or Class members' voiceprints through either mechanism, inform any Plaintiff or Class member in writing that biometric identifiers were being collected or stored, inform any of them in writing of the specific purpose or length of term of collection, or receive a written release. Adobe obtained no consent of any kind, in any form, from any Plaintiff or Class member.

139. Adobe's violations of § 15(b) were intentional or reckless, as alleged at ¶¶ 109-116. In the alternative, Adobe's violations were negligent.

140. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member and each violation, the greater of liquidated damages of $1,000 (negligent) or $5,000 (intentional or reckless) or actual damages, on a per-person, per-subsection basis consistent with the statute as amended and as construed in Clay v. Union Pacific Railroad Co., No.

25-2185 (7th Cir. Apr. 1, 2026); injunctive relief on the terms set forth in the Prayer for Relief; and reasonable attorneys' fees, costs, expert witness fees, and other litigation expenses.

**Count II**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)**

*Brought on behalf of the Class*

141. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

142. Plaintiffs bring this Count individually and on behalf of the Class.

143. Section 15(a) of BIPA requires a private entity in possession of biometric identifiers or biometric information to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Plaintiffs and Class members never interacted with Adobe in connection with the collection of their biometric data, the operative destruction prong is that the biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

144. Adobe has been, and remains, in possession of voiceprints and biometric information extracted from Plaintiffs' and Class members' voice recordings, both through training-data ingestion and through runtime

extraction. Those voiceprints persist in the parameters of Adobe's foundational voice synthesis models and continue to be deployed in the commercial products Adobe ships today.

145. Adobe has not developed and made publicly available a retention and destruction policy applicable to voiceprints extracted from non-user training-data subjects and encoded in Adobe's foundational voice synthesis models, or applicable to voiceprints extracted at runtime from speakers captured in user-uploaded recordings. The retention provision in Adobe's Privacy Policy is tied to a user-controlled feature toggle — "we delete this information once you turn off the feature" — that is facially inapplicable to non-users, who have no account-level relationship through which to turn any feature on or off. Adobe has not provided, and on information and belief does not maintain, any mechanism by which Plaintiffs or other non-user training-data subjects or non-user runtime-extraction subjects can request access to, correction of, or deletion of their biometric data.

146. Adobe's violations of § 15(a) were intentional or reckless, as alleged at ¶¶ 109-116. In the alternative, Adobe's violations were negligent.

147. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count III**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)**

*Brought on behalf of the Class*

148. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

149. Plaintiffs bring this Count individually and on behalf of the Class.

150. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond selling, leasing, or trading.

151. Adobe has profited, and continues to profit, from Plaintiffs' and Class members' voiceprints and biometric information by using them to develop, train, and commercially operate the voice synthesis products at issue, and by monetizing those products through the integrated commercial channels alleged at ¶¶ 86-88, including: Firefly Standard and Firefly Pro subscription fees; Creative Cloud subscription fees across Single App, All Apps, Pro, Teams, and Enterprise tiers; enterprise Creative Cloud, enterprise voice product, and Translate and Lip Sync API licensing revenue; Firefly Services API and developer-platform revenue tied to Adobe's voice models; commercial value derived from the Enhance Speech feature in Adobe Podcast and the Firefly app; partnership and platform value Adobe extracts by integrating partner voice models, including ElevenLabs Multilingual v2, into the Generate Speech

surface alongside the Firefly Speech Model; and strategic deployment value of voice synthesis capability across Adobe's broader Digital Media and Digital Experience product portfolio. The voice quality, expressiveness, speaker similarity, and multilingual capability Adobe sells through these channels exists because of the voiceprints encoded in Adobe's foundational voice synthesis models: the biometric data and the product are, at this point, the same thing. Adobe's profiting from Plaintiffs' and Class members' biometric identifiers does not fall within any exception to § 15(c).

152. Adobe's violations of § 15(c) were intentional or reckless, as alleged at ¶¶ 109-116. In the alternative, Adobe's violations were negligent.

153. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count IV

## Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)

*Brought on behalf of the Class*

154. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

155. Plaintiffs bring this Count individually and on behalf of the Class.

156. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's biometric identifier or biometric information unless an enumerated exception applies. 740 ILCS 14/15(d).

157. On information and belief, Adobe has disclosed, redisclosed, and otherwise disseminated Plaintiffs' and Class members' voiceprints and biometric information — including data embedded in Adobe's foundational voice synthesis models and data extracted at runtime by Adobe's voice products — to Adobe's affiliates, vendors, and service providers, and across the United States, India, Ireland, and other jurisdictions in which Adobe and its subsidiaries operate. Adobe's Privacy Policy expressly provides for disclosure of personal information to "other companies in the Adobe family" and to "service providers" and "data processors," and identifies the United States and India as the principal locations where Adobe processes personal information, with transfers to other countries in which Adobe and its affiliates, providers, and partners operate. Plaintiffs and Class members did not consent to any of these disseminations. No enumerated exception under § 15(d) applies.

158. Adobe's violations of § 15(d) were intentional or reckless, as alleged at ¶¶ 109-116. In the alternative, Adobe's violations were negligent.

159. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count V**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(e)**

*Brought on behalf of the Class*

160. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

161. Plaintiffs bring this Count individually and on behalf of the Class.

162. Section 15(e) of BIPA imposes two distinct duties on private entities in possession of biometric data: under § 15(e)(1), to store, transmit, and protect the data using the reasonable standard of care within the entity's industry; and under § 15(e)(2), to do so in a manner the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: an entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information. A generally adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

163. Adobe fails the § 15(e)(2) asymmetry test on three independent grounds.

164. *First*, Adobe protects its own confidential commercial information under closed-system controls materially more protective than its protection of non-user biometric data. Adobe maintains the source code for its core commercial products as closed-source proprietary information. Adobe protects its proprietary product architectures, internal financial records, employee personnel files, customer data, and business communications under strict access controls, encryption, internal classification systems, and information-security regimes. The voiceprints Adobe extracted from non-user training-data subjects and from non-user speakers captured in user-uploaded runtime-extraction recordings, by contrast, are encoded in commercial models that

Adobe distributes to subscribers and enterprise customers worldwide, embedded in product outputs delivered to any paying user, and held without access controls, audit-logging, encryption standards, or retention-and-destruction safeguards verifiable to the data subjects.

165. *Second*, Adobe maintains a structural asymmetry between how it protects biometric data of users and biometric data of non-users. Adobe's Privacy Policy provides that "[w]here we process biometric identifiers or biometric information to deliver a feature requested by you, we delete this information once you turn off the feature, unless otherwise specified in the Software or Services." That deletion mechanism is available to account-holding users who have toggled a consumer-facing voice feature on or off. Non-user training-data subjects and non-user speakers captured in user-uploaded runtime-extraction recordings — including Plaintiffs and Class members — have no account through which to engage that toggle and no equivalent deletion mechanism. Adobe protects user-subject biometric data under a documented deletion architecture and protects non-user-subject biometric data under no comparable safeguard.

166. *Third*, Adobe's transfer architecture routes personal information — including, on information and belief, biometric data extracted from non-user voice recordings — to Adobe's affiliates, vendors, service providers, and data-processing operations in the United States, India, Ireland, and other jurisdictions, without safeguards specific to non-user voiceprints verifiable to the data subjects. Other categories of confidential commercial information

Adobe handles — the source code, trade-secret, employee, and customer data identified at ¶ 158 — remain under closed-system controls, are not similarly transferred to multi-jurisdictional service-provider chains under generalized policy disclosures, and are subject to internal classification and audit regimes Adobe has not extended to non-user biometric data.

167. Adobe independently fails the § 15(e)(1) reasonable-standard-of-care test as to voiceprints extracted from non-user training data and non-user runtime-extraction subjects. The reasonable standard of care within the AI and machine learning industry for the handling of biometric training data includes documented provenance, access controls, audit logging, encryption, a documented retention and destruction schedule, and a mechanism through which data subjects may request access to, correction of, or deletion of their biometric data. As alleged at ¶¶ 47, 52, 76-82, Adobe has published none of these with respect to its voice training data, runtime-extracted voice characteristics, or the biometric characteristics encoded in its voice models, and provides no mechanism through which non-user data subjects may request access to, correction of, or deletion of their biometric data from Adobe's training datasets, model parameters, or commercial inference pipelines. A private entity cannot adequately protect biometric data belonging to individuals to whom it has never disclosed possession of that data, because those individuals have no ability to monitor, verify, or challenge how their data is stored, transmitted, or protected.

168. The asymmetry between Adobe's user-facing and own-data protections and Adobe's complete absence of protection for Class members' biometric data is not a function of technical limitation; it is a function of selective application.

169. Adobe's violations of § 15(e)(1) and § 15(e)(2) were intentional or reckless, as alleged at ¶¶ 109-116. In the alternative, Adobe's violations were negligent.

170. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I, including the destruction or retraining of the foundational voice synthesis models in which Class members' voiceprints are encoded.

**Count VI**

**Violation of the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq.**

*Brought on behalf of the Class*

171. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

172. Plaintiffs bring this Count individually and on behalf of the Class.

173. IRPA provides that "[a] person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent." 765 ILCS 1075/30(a). "Identity" is defined to include "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener," and expressly enumerates "voice" among the protected attributes. 765 ILCS 1075/5.

174. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

175. Adobe used Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a). Adobe extracted and modeled the distinctive vocal characteristics embodied in Plaintiffs' and Class members' recordings and used those characteristics to develop, train, and commercially operate the voice synthesis products Adobe monetizes through the integrated commercial channels alleged at ¶¶ 86-88. Adobe holds out its products' ability to generate realistic, expressive, and human-sounding voices — and, in the case of the Firefly Voice Model, its ability to preserve a speaker's voice characteristics across translated audio — as a core commercial feature, a capability built on the vocal identities of the individuals whose recordings were used to train the foundational models and from whose recordings voice characteristics are extracted at runtime.

176. IRPA, as amended by P.A. 103-836 effective January 1, 2025, separately prohibits knowingly distributing, transmitting, or otherwise making available to the general public a sound recording or audiovisual work containing an "unauthorized digital replica" of an individual's voice. 765 ILCS 1075/30(b). The statute defines an "unauthorized digital replica" as a newly created, electronically generated representation of an individual's voice fixed in

a sound recording or audiovisual work in which the individual did not actually perform, made without the individual's consent. 765 ILCS 1075/5. The statute also imposes liability on any person who knowingly materially contributes to or facilitates such distribution. 765 ILCS 1075/30(d).

177. On information and belief, Adobe's voice synthesis and voice-cloning products generate, distribute, and make available to the public voice outputs that replicate or closely simulate the distinctive vocal characteristics of Plaintiffs and Class members — including through the Firefly Voice Model's voice-preserving translation capability and through Firefly Speech Model outputs that incorporate speaker characteristics learned during training. By generating and distributing those outputs through Firefly Standard and Firefly Pro, Creative Cloud, enterprise Creative Cloud, the Translate and Lip Sync API, the Adobe Podcast and Firefly app, and Adobe's integration of partner voice models (including ElevenLabs Multilingual v2) into Generate Speech, Adobe knowingly distributes and makes available sound recordings containing unauthorized digital replicas and knowingly materially contributes to and facilitates their distribution.

178. Adobe's violations of IRPA were willful and knowing. Adobe demonstrated through its Firefly Stock Contributor Bonus program, and through its commercial integration of ElevenLabs' consent-based Iconic Marketplace framework into Generate Speech, that Adobe knows how to design and deploy consent-and-compensation infrastructure for voice and likeness content when it chooses to do so. Adobe built that infrastructure for selected

categories of contributors. Adobe did not build it for the individuals whose voices were used to train its foundational voice models or whose voice characteristics are extracted at runtime.

179. Plaintiffs and the Class have suffered and continue to suffer injury, including loss of control over the commercial use of their identities, dilution and commodification of their voices, displacement in the professional markets where they earn their livelihoods, and economic losses including diversion of licensing value and diminished demand for authentic vocal performances.

180. Plaintiffs and the Class seek all relief available under IRPA, including actual damages, the profits Adobe earned from its unauthorized use to the extent not taken into account in computing actual damages, statutory minimum damages of $1,000 per violation under 765 ILCS 1075/40, punitive damages, injunctive relief on the terms set forth in the Prayer for Relief, and reasonable attorneys' fees and costs under 765 ILCS 1075/55.

## Count VII

## Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.

*Brought on behalf of the Class*

181. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

182. Plaintiffs bring this Count individually and on behalf of the Class.

183. Adobe engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice synthesis

services to Illinois residents and by collecting, extracting, and commercially exploiting the biometric identifiers and biometric information of Illinois-recorded speakers.

184. Adobe's conduct is unfair within the meaning of ICFA under the three-part test articulated in *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002). *First*, Adobe's conduct offends Illinois public policy as embodied in BIPA and IRPA — Illinois statutes specifically enacted to protect biometric privacy and the commercial use of personal identity. *Second*, Adobe's conduct causes substantial economic and privacy injury to Illinois residents, including the irreplaceable loss of control over biometric identifiers, the unauthorized commercial use of vocal identities, and market displacement in the professional voice industries where Plaintiffs and Class members earn their livelihoods. *Third*, the injury could not reasonably have been avoided by Plaintiffs and Class members, who had no knowledge that their voice recordings were being ingested into Adobe's training pipelines or processed at runtime, no notice of the extraction, no mechanism to refuse, and no mechanism even to discover whether their biometric data was in Adobe's possession.

185. Adobe's conduct is independently deceptive within the meaning of ICFA. Adobe characterized its Firefly Speech Model and Firefly Voice Model as "commercially safe" and as trained on "licensed" or "responsibly sourced" content while declining to identify the licenses, sources, or rights-holders. Adobe used hedging language in some privacy disclosures ("such

characteristics may be considered biometric identifiers or biometric information under certain US laws") while expressly enumerating "voiceprints" as a category of biometric identifier Adobe collects in others. These omissions and inconsistencies were material: a reasonable person evaluating Adobe's voice products, or assessing whether their own voice recordings might have been used as training data, would attach significance to whether Adobe's training corpus was lawfully obtained. The prior Bloomberg investigative reporting establishing that Adobe's analogous representations about its image-model training data did not match the underlying training-data practices confirms the deceptive character of the same conclusory framing applied to voice.

186. Adobe's unfair and deceptive conduct proximately caused actual economic injury to Plaintiffs and the Class, including lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from Adobe's decision to collect and commercially exploit Plaintiffs' biometric data without authorization, not from the mere existence of competing AI products.

187. Adobe's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and the Class, as alleged at ¶¶ 109-116.

188. Plaintiffs and the Class seek all relief available under ICFA, including actual economic damages, punitive damages under 815 ILCS 505/10a(c), injunctive relief on the terms set forth in the Prayer for Relief,

attorneys' fees and costs under 815 ILCS 505/10a, and such other relief as the Court deems just and proper.

## Count VIII

## Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.

*Brought on behalf of the Class (injunctive relief only)*

189. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

190. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

191. Adobe has engaged in deceptive trade practices likely to cause confusion or misunderstanding in the marketplace within the meaning of 815 ILCS 510/2(a)(2) (likelihood of confusion or misunderstanding as to source, sponsorship, approval, or certification of goods or services) and 815 ILCS 510/2(a)(3) (likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another). Adobe's voice synthesis products generate voice outputs that simulate authentic human speech. Once generated, these outputs can be downloaded, shared, distributed, and commercially exploited without consumer-facing disclosure that the voice was AI-generated, that the underlying foundational models were built on voiceprints extracted without consent, or that the speakers whose vocal characteristics are reproduced did not authorize the use. This creates a likelihood of confusion about whether real human speakers, including Plaintiffs

and other Illinois-recorded voice professionals, created, endorsed, sponsored, or authorized the synthetic voice content.

192. Plaintiffs and Class members are persons likely to be damaged by Adobe's deceptive practices. Adobe's conduct diverts demand from licensed human voice performances, impairs attribution and provenance in the voice services markets where Plaintiffs and Class members earn their livelihoods, and creates marketplace confusion about the source and authorization status of AI-generated voice content. Under 815 ILCS 510/3, actual confusion and actual damages need not be shown.

193. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring Adobe to provide adequate consumer-facing disclosure that voice outputs are AI-generated, that the underlying foundational voice models were built using voice recordings of unidentified speakers, and that the individuals whose vocal characteristics are reproduced did not authorize the use. Adobe's conduct was willful within the meaning of 815 ILCS 510/3, entitling Plaintiffs and the Class to reasonable attorneys' fees.

**Count IX**

**Unjust Enrichment (Illinois Common Law)**

*Brought on behalf of the Class*

194. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

195. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

196. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

197. Adobe obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, biometric information, and identity attributes without permission and without compensation. These benefits include the avoided costs of licensing or obtaining consent for the voice recordings used to train Adobe's foundational voice synthesis models and processed at runtime by Adobe's voice products; the product capability and competitive advantage Adobe captured by training its models on a diverse corpus of professional and incidental human voices, including the voices of Plaintiffs and Class members; and the revenue Adobe generates and continues to generate through the commercial exploitation of those models and products, as alleged at ¶¶ 86-88.

198. Adobe obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invested time, talent, training, and resources to develop their voices and create professional or otherwise valuable recordings. Adobe's unauthorized extraction of voiceprints from those recordings diverted economic value from Plaintiffs and Class members to

Adobe, and Adobe's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods.

199. Adobe's retention of these benefits is unjust. Adobe's conduct violated the Illinois statutory protections for biometric data (BIPA) and personal identity (IRPA), each of which expresses the public policy of Illinois that the unauthorized commercial extraction of biometric and identity-related personal attributes is unlawful. Adobe's institutional practice confirms the inequity of its retention: through the Firefly Stock Contributor Bonus program, and through Adobe's commercial integration of ElevenLabs' consent-based Iconic Marketplace framework into Generate Speech, Adobe demonstrated that it knows how to build and deploy consent-and-compensation infrastructure for selected categories of content. Adobe did not apply equivalent infrastructure to the individuals whose voices it used to train its foundational voice models or whose voice characteristics it extracts at runtime. Adobe could have pursued a lawful licensing path with respect to Plaintiffs and Class members; it chose not to.

200. Plaintiffs and the Class seek restitution of the benefits Adobe has unjustly retained, including disgorgement of Adobe's profits attributable to the unauthorized exploitation of Plaintiffs' and Class members' voiceprints, biometric information, and identities; an accounting of those benefits; and such other equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

A. *Class Certification*. Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

B. *Judgment*. Enter judgment in favor of Plaintiffs and all Class members and against Defendant Adobe Inc. on all Counts on which Adobe is found liable.

C. *Declaratory and Injunctive Relief*. Enter declaratory and permanent injunctive relief, and where appropriate preliminary injunctive relief, requiring Adobe to:

(1) Cease collecting, capturing, purchasing, receiving through trade, or otherwise obtaining voiceprints or biometric information from voice recordings produced or recorded in Illinois unless Adobe has first complied with 740 ILCS 14/15(b)'s written-notice, written-purpose-and-duration, and written-release requirements with respect to the speaker, both as to (a) the development, training, fine-tuning, evaluation, and operation of Adobe's voice synthesis and voice recognition models, and (b) the runtime processing of voice recordings submitted to Adobe's commercial voice products, including without limitation Translate Video, Translate Audio, and Translate and Lip Sync;

(2) Cease the commercial use, sale, lease, trade, profiting from, and dissemination of voiceprints and biometric information of Plaintiffs and Class members that Adobe obtained without BIPA-compliant consent, including through the continued operation of the Firefly Speech Model, the Firefly Voice Model, Generate Speech, Translate Video, Translate Audio, the Translate and Lip Sync API, and the Enhance Speech feature;

(3) Develop, publish, and maintain a written retention and destruction policy, made available to the public, that complies with 740 ILCS 14/15(a) and that applies to all voiceprints and biometric information extracted from voice recordings ingested into Adobe's voice synthesis, voice recognition, and related voice-AI training pipelines, or extracted at runtime by Adobe's commercial voice products, including all such data already in Adobe's possession at the time of judgment;

(4) Identify, in a court-supervised disclosure to Class counsel and to the Court, the sources, scale, provenance, and acquisition pathways of the voice data used to train, fine-tune, evaluate, or operate Adobe's voice synthesis and voice recognition models during the Class Period, and the sources of voice recordings processed at runtime by Adobe's voice products, including each contractual instrument, platform, dataset, and corpus from which voice recordings were obtained;

(5) Provide, on terms approved by the Court, a mechanism by which non-users, including Plaintiffs and Class members, may (i) request notice of whether their voice recordings were ingested into Adobe's training

pipelines or processed at runtime by Adobe's commercial voice products, (ii) request access to the biometric data Adobe holds derived from their recordings, (iii) request correction or deletion of that data, and (iv) opt out of further use of that data in Adobe's voice models and downstream commercial products;

(6) Identify and disclose every Adobe subsidiary, affiliate, vendor, service provider, and third-party processor with access to the voiceprints and biometric information extracted from voice recordings produced or recorded in Illinois, and terminate any access by such entities that is not necessary to compliance with this Court's order;

(7) Destroy, or retrain without the unlawfully obtained data, every voice synthesis, voice recognition, and related voice-AI model in which voiceprints and biometric information extracted from voice recordings produced or recorded in Illinois are encoded — including without limitation the Firefly Speech Model and the Firefly Voice Model — together with each downstream model, fine-tuned model, derivative model, and commercial product whose operation depends on or incorporates those models, including Generate Speech, Translate Video, Translate Audio, the Translate and Lip Sync API, and the Enhance Speech feature in Adobe Podcast and the Firefly app; and certify in writing that the unlawfully obtained voiceprints and biometric information no longer reside in, and cannot be reproduced by, any model or product Adobe distributes or operates;

(8) As to any open-weight, third-party, or external release of Adobe voice models in which the unlawfully obtained data is encoded, take all

reasonable measures to recall and remove the affected model parameters from public availability, including by issuing takedown requests, ceasing further distribution, and ceasing further support of derivative releases;

(9) Implement protective measures for any voiceprints or biometric information lawfully obtained going forward that satisfy 740 ILCS 14/15(e), including, at a minimum, the storage, transmission, encryption, isolation, scope-restriction, and access-control measures Adobe applies to its source code, proprietary architecture, internal financial records, customer data, and other categories of confidential commercial information;

(10) Cease using Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent in violation of 765 ILCS 1075/30(a); cease knowingly distributing or making available sound recordings or audiovisual works containing unauthorized digital replicas of Plaintiffs' or Class members' voices in violation of 765 ILCS 1075/30(b); and cease materially contributing to or facilitating such distribution in violation of 765 ILCS 1075/30(d); and

(11) Implement corrective consumer-facing disclosures, in such form as the Court approves, sufficient to inform consumers that voice outputs generated by Adobe's voice products are AI-generated, that the underlying foundational voice models were built using voice recordings of unidentified speakers, and that the individuals whose vocal characteristics are reproduced did not authorize the use, and to prevent confusion under 815 ILCS

510/2(a)(2) and (a)(3) about the source, authorization, and consent status of AI-generated voice content Adobe distributes.

D. *BIPA Statutory Damages*. Award liquidated or actual damages on a per-person, per-subsection basis under 740 ILCS 14/20, as amended by P.A. 103-769 (effective August 2, 2024) and as construed in Clay v. Union Pacific Railroad Co., No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $5,000 per intentional or reckless violation, or in the alternative $1,000 per negligent violation, for violations of 740 ILCS 14/15(a), (b), (c), (d), and (e).

E. *IRPA Damages*. Award actual damages, statutory damages of $1,000 per violation under 765 ILCS 1075/40, punitive damages, and disgorgement of profits Adobe earned from its unauthorized commercial use of Plaintiffs' and Class members' identities to the extent not taken into account in computing actual damages.

F. *ICFA Damages*. Award actual economic damages and punitive damages under 815 ILCS 505/10a(c).

G. *Restitution and Disgorgement*. Order restitution to Plaintiffs and the Class of the benefits Adobe has unjustly retained, and disgorgement of Adobe's profits attributable to the unauthorized collection, retention, and commercial exploitation of Plaintiffs' and Class members' voiceprints, biometric information, and vocal identities, including profits derived from: (i) Firefly Standard and Firefly Pro subscription fees; (ii) Creative Cloud subscription fees across Single App, All Apps, Pro, Teams, and Enterprise tiers attributable to access to Adobe's voice products; (iii) enterprise Creative Cloud, enterprise

voice product, and Translate and Lip Sync API licensing revenue; (iv) Firefly Services API and other developer-platform revenue tied to Adobe's voice models; (v) commercial value derived from the Enhance Speech feature in Adobe Podcast and the Firefly app; (vi) the partnership and platform value Adobe extracts by integrating partner voice models, including ElevenLabs Multilingual v2, into the Generate Speech surface alongside the Firefly Speech Model; and (vii) strategic deployment value of voice synthesis capability across Adobe's Digital Media and Digital Experience product portfolio; together with an accounting of all such revenues and benefits.

H. *Non-Duplication*. Order such relief as the Court determines necessary to ensure no duplicative recovery across statutory, common-law, and equitable claims. Plaintiffs' claims for the same conduct under multiple statutes and theories are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3); the Court may award the relief that, in its judgment, makes Plaintiffs and Class members whole and addresses the unlawful conduct.

I. *Attorneys' Fees and Costs*. Award reasonable attorneys' fees, costs, expert witness fees, and other litigation expenses under 740 ILCS 14/20, 765 ILCS 1075/55, 815 ILCS 505/10a, 815 ILCS 510/3, and any other applicable provision.

J. *Pre- and Post-Judgment Interest*. Award pre-judgment and post-judgment interest at the maximum rate permitted by law, including the rate available under 815 ILCS 205/2 for pre-judgment interest where applicable.

K. *Service Awards*. Award service awards to the named Plaintiffs in such amount as the Court deems appropriate to compensate them for their services to the Class.

*L.* *Other Relief.* Grant such other and further relief as the Court deems just, equitable, and proper.

**JURY TRIAL REQUESTED**

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: May 13, 2026

LOEVY & LOEVY

/s/ Ross Kimbarovsky

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Lindsey Dorcus, Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Yohance Lacour, and Victoria Nassif.*